[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Noling,* Slip Opinion No. 2018-Ohio-795.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2018-OHIO-795

THE STATE OF OHIO, APPELLEE, *v.* NOLING, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Noling,* Slip Opinion No. 2018-Ohio-795.]**

*Criminal law—Postconviction DNA testing—An appellate court has jurisdiction over a claim raised by an offender who has requested postconviction DNA testing if the claim challenges any of the three discretionary decisions specifically listed as appealable in R.C. 2953.72(A)(8) or if the claim is that the trial court failed to fulfill a mandatory duty—R.C. 2953.81(C)'s requirement that the testing authority provide the subject offender with "the results of the testing" mandates that the offender be provided only the DNA profile created for the purpose of a comparison with the DNA profiles in the Combined DNA Index System.*

(No. 2014-1377—Submitted June 20, 2017—Decided March 6, 2018.)

APPEAL from the Court of Common Pleas of Portage County,

No. 1995 CR 220.

**FISCHER, J.**

{¶ 1} In this direct appeal as of right, Tyrone Noling, a capital defendant, has appealed from several rulings of the Court of Common Pleas of Portage County relating to his second application for postconviction DNA testing. For the reasons below, we affirm the lower court's judgment in part and reverse it in part.

## I. RELEVANT BACKGROUND

{¶ 2} Noling was found guilty of aggravated murder and was sentenced to death for killing Bearnhardt and Cora Hartig in Portage County in 1990. The court of appeals and this court affirmed Noling's convictions and death sentence. *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88 ("*Noling I*"). Noling also filed a petition seeking a federal writ of habeas corpus, which was denied, and he has filed numerous applications for state postconviction relief.

{¶ 3} The only issues presently before this court relate to Noling's request for postconviction DNA testing under R.C. 2953.71 through 2953.81.

### A. Noling filed an application for DNA testing of a cigarette butt

{¶ 4} Noling filed his first application for DNA testing in 2008, seeking testing of a cigarette butt found on the driveway of the Hartig home. Noting that a DNA test conducted before trial had already excluded Noling and his codefendants as the source of the DNA on the cigarette butt, the trial court rejected Noling's application, because it found that the earlier DNA test was definitive. *State v. Noling*, 136 Ohio St.3d 163, 2013-Ohio-1764, 992 N.E.2d 1095, ¶ 4 ("*Noling II*").

### B. Noling filed a second application for DNA testing

{¶ 5} In 2010, Noling filed a second application for DNA testing of the cigarette butt, arguing that testing was warranted because newly discovered evidence pointed to other suspects in the murders. *Id*. at ¶ 6.

{¶ 6} First, Noling alleged that the prosecution had failed to disclose a statement made by Nathan Chesley that inculpated Chesley's foster brother, Daniel Wilson, in the Hartig murders. In an affidavit submitted in support of the

application, Chesley described Wilson to police as a heavy drinker and a violent person who had committed thefts and broken into homes at the time of the Hartig murders. He also stated that Wilson drove a blue Dodge Omni—this is possibly significant because another witness saw a dark blue, midsize car near the Hartig residence on the day of the murders. According to Noling, previous analysis of the cigarette butt and of Wilson's saliva did not exclude Wilson as the source of the DNA on the cigarette butt. *Id.*

**{¶ 7}** Second, Noling alleged that previously undisclosed documents identified other possible suspects, including the Hartigs' insurance agent, who had defaulted on a loan from the Hartigs. Noling claimed that because of advances in DNA technology, it would now be possible to positively identify the individual whose DNA is on the cigarette butt and that DNA identification of one of the previously undisclosed suspects would be "outcome determinative," because it would identify that person as the killer. *Id*., 136 Ohio St.3d 163, 2013-Ohio-1764, 992 N.E.2d 1095, at ¶ 6. The trial court again denied Noling's application. *Id*. at ¶ 7.

### C. This court remanded for consideration of further testing

**{¶ 8}** On appeal from the denial of Noling's second application for DNA testing, we held that R.C. 2953.73(E)(1) is constitutional. *Noling II* at paragraph one of the syllabus. We also held that "[b]efore dismissing a subsequent application for postconviction DNA testing under R.C. 2953.72(A)(7), a trial court must apply the definition of 'definitive DNA test' set forth in R.C. 2953.71(U) and the criteria of R.C. 2953.74." *Id*. at paragraph two of the syllabus.

**{¶ 9}** We reversed and remanded for the trial court to "consider whether the evidence regarding Wilson or the other suspects * * * show[s] by a preponderance of the evidence that there is a possibility of discovering new biological material from the perpetrator that the prior DNA test may have failed to discover." *Id*. at ¶ 42.

3

**D. Noling filed a motion to amend his second application**

{¶ 10} After we decided *Noling II*, Noling filed a motion in October 2013 to amend his second application for DNA testing. He requested testing of the shell casings collected from the Hartigs' kitchen and the ring boxes collected from their bedroom. He also requested submission of the shell casings and projectiles from the crime scene to the FBI's National Integrated Ballistic Information Network ("NIBIN") for a possible match with the missing murder weapon.

{¶ 11} The state objected to Noling's motion, arguing that the shell casings and ring boxes had been contaminated and were not suitable for DNA testing. The state pointed out that this evidence was collected and examined before exacting standards for handling evidence to preserve uncontaminated DNA for testing were in place. The state also objected to submitting the shell casings to NIBIN, because that request was unrelated to Noling's motion to amend his DNA application.

{¶ 12} The trial court granted Noling's motion to amend his application. The court overruled Noling's request to submit the shell casings to NIBIN, because no statutory procedure exists to make such a request.

**E. BCI tested the cigarette butt**

{¶ 13} In December 2013, the trial court ordered the Ohio Bureau of Criminal Investigation ("BCI") to collect DNA evidence from the cigarette butt and compare the DNA profile created from that evidence with the DNA profiles in the Combined DNA Index System ("CODIS"), a database of DNA profiles created by law-enforcement agencies. The comparison revealed that the DNA was from "an unknown male." BCI also reported that the DNA profile was compared with profiles in the local, state, and national levels of the CODIS database "without a hit." Additionally, BCI confirmed that Wilson's DNA profile was in a database that was searched.

{¶ 14} The state provided Noling with a one-page report. The report included a statement that "DNA profiling was performed using the polymerase

chain reaction at the short tandem repeat loci" and listed the loci that were identified. The report did not include the DNA profile that was created as a result of this process but did include the statement that "[t]he DNA profile from the cutting from the cigarette butt (Item 1.1.1) is from an unknown male."

**F. Noling filed a motion for a "Copy of Complete DNA Test Results"**

{¶ 15} After receiving BCI's results, Noling filed a motion requesting a "Copy of Complete DNA Test Results," including laboratory notes, allelic charts, electropherograms, and quantification measurements that BCI generated. He argued that the single-page report provided to the defense reflected only the testing authority's conclusions about the DNA results and that the report did not include all the results of the testing. The state objected, citing the absence of a statutory requirement to release additional information. *See* R.C. 2953.81(C). The trial court denied the motion.

**G. The trial court ordered BCI to determine the quantity and quality of biological material on the ring boxes and shell casings**

{¶ 16} On December 19, 2013, the trial court ordered the prosecutor and BCI to prepare findings regarding the quantity and quality of the parent sample of the ring boxes and shell casings ("the December 19 order"). The court directed the "testing authority" to determine whether there is "a scientifically sufficient quantity of the parent sample to test, [and] whether the parent sample is so minute or fragile that there is a substantial risk that the parent sample could be destroyed."

**H. Noling requested Cellmark as the testing authority**

{¶ 17} On December 26, 2013, Noling moved the court to stay the December 19 order, and on December 30, he moved the court to amend that order to select Orchid Cellmark Laboratories ("Cellmark") as the testing authority for the ring boxes and shell casings. Noling argued that Cellmark was best equipped to answer the trial court's question regarding the quantity and quality of biological material on the evidence, because it used more advanced DNA technology. Noling

5

also argued that advanced testing was needed to resolve the state's claim that the evidence was contaminated.

{¶ 18} At a subsequent hearing, the defense presented Dr. Rich Staub, an expert in DNA and forensic testing, to explain why Cellmark was the better choice to conduct testing on the shell casings and ring boxes. He stated that advanced DNA-testing capabilities were necessary to identify DNA on evidence handled by multiple persons. Staub testified that Cellmark used a commercial kit for DNA analysis that was more sensitive and "less susceptible to inhibitors" than those used by BCI.

{¶ 19} The state presented the affidavit of Dr. Lewis Maddox, the DNA technical leader at BCI. Maddox stated that in the 1990s, BCI laboratory, latent-print, and firearms analysts did not follow sterile procedures to minimize low-level contamination. He stated that the "use of current-or-future DNA tests on evidence which has been clearly subject to contamination, followed by the assertion that the presence of unattributable partial results are evidence of alternative subjects does not shed light on who may have touched the casings or jewelry box during the crime in 1990." He stated that he could "think of no way to rule out contamination from years of mishandling."

{¶ 20} Maddox stated that BCI does not conduct DNA testing on fired casings unless the forensic question is related to handling after firing. Maddox added that "BCI cannot upload DNA profiles for [a] CODIS search from a kit that it has not validated." He also stated that BCI uses "the Identifiler kit and cannot assume ownership of data from vendor laboratories that use other kits such as MiniFiler, Identifiler Plus, or PowerPlex 16HS for CODIS upload."

## I. The trial court ordered BCI to conduct quantity and quality evaluations of the shell casings and ring boxes

{¶ 21} Noling objected to the trial court's designation of BCI as the testing authority for the quantity and quality evaluation. Noling quoted R.C. 2953.78(B)

and argued that his objection required the trial court to "rescind its prior acceptance of the application for DNA testing."

{¶ 22} Noling also stated that testing of the cigarette butt was intertwined with the testing of the shell casings and ring boxes, because the profiles from all of those items would have to be compared with each other. Accordingly, Noling argued that the trial court was required to deny his own amended application in its entirety, including further testing of the cigarette butt and any remaining DNA extracts from earlier testing of the cigarette butt.

{¶ 23} On May 2, 2014, the trial court, sua sponte, vacated the December 19 order and issued an order requiring the state and BCI to prepare specific findings about the quantity and quality of the evidence for testing. In its order, the court made clear that it needed this information to determine whether Noling's application satisfied the necessary criteria for a DNA-testing application under R.C. 2953.74(C). The court explained that it still had "to determine whether to accept [Noling's] amended application for DNA testing."

### J. BCI determined that the shell casings and ring boxes were contaminated

{¶ 24} On June 10, 2014, BCI reported that the shell casings and ring boxes were contaminated and "scientifically unsuitable for testing." BCI stated that "[v]isual examination" showed that case information had been written on the casings with a presumed nonsterile pen and that the ring boxes were packaged in a sealed bag in contact with each other.

{¶ 25} BCI also stated that these "touch DNA samples were processed previously by latent print and firearms disciplines in a manner that would not minimize contamination." BCI noted that the latent-print examination included "superglue fuming and dusting with non-sterile powder and brushes."

### K. Noling's amended application for DNA testing was dismissed

{¶ 26} On June 27, 2014, the trial court dismissed Noling's amended application, finding that the items submitted for testing did not comply with R.C.

7

2953.74(C)(2)(c) because BCI had found them "contaminated" and "scientifically unsuitable for testing."

### L. This court determined that Noling has an appeal of right

{¶ 27} On August 11, 2014, Noling sought discretionary review from this court of the trial court's rulings on DNA testing following the remand we ordered in *Noling II*. We accepted jurisdiction to review Noling's constitutional challenge to R.C. 2953.73(E)(1), which set forth the procedure by which an offender sentenced to death could appeal the trial court's denial of an application for postconviction DNA testing. R.C. 2953.73(E)(1) provided that a capital offender could "seek leave of the supreme court to appeal the rejection to the supreme court," while R.C. 2953.73(E)(2) affords an appeal of right to the court of appeals for noncapital offenders appealing the denial of DNA-testing applications.

{¶ 28} In *State v. Noling*, 149 Ohio St.3d 327, 2016-Ohio-8252, 75 N.E.3d 141 ("*Noling III*"), we held that R.C. 2953.73(E)(1) denied equal protection under the United States and Ohio Constitutions. We excised the unconstitutional provisions of the statute to create a procedure that provides an appeal of right to this court for capital offenders. *Noling III* at ¶ 64. We converted Noling's appeal to an appeal of right. *Id*.

### II. ISSUES ON APPEAL

{¶ 29} Noling argues that the state was required to provide him with all documentation relating to the DNA testing of the cigarette butt—including, but not limited to, the DNA profile itself, electropherograms, and laboratory notes (proposition of law No. I). Noling also argues that the trial court should have granted his request that the shell casings be submitted to NIBIN (proposition of law No. II) and that his objections relating to BCI's selection as the testing authority and to its preliminary determination as to the scientific suitability for DNA testing of the shell casings and ring boxes should have been upheld (proposition of law Nos. III, IV, and V). We address these claims out of order.

## A. The scope of the appeal

{¶ 30} As a threshold issue, we must determine if this court has jurisdiction to rule on Noling's claims. The right to appeal the trial court's decisions made pursuant to R.C. 2953.71 through 2953.81 is not unlimited. *See Noling III* at ¶ 63. Further, the state argues that we should not consider some of Noling's claims because they do not relate to the trial court's denial of Noling's amended application for DNA testing.

{¶ 31} R.C. 2953.72(A)(8) provides that when requesting DNA testing pursuant to R.C. 2953.71 through 2953.81, an eligible offender must submit an acknowledgment form stating that

> the court of common pleas has the sole *discretion* subject to an appeal as described in this division to determine whether an offender is an eligible offender and whether an eligible offender's application for DNA testing satisfies the acceptance criteria described in division (A)(4) of this section and whether the application should be accepted or rejected, that if the court of common pleas rejects an eligible offender's application, the offender may appeal the rejection, and that no determination otherwise made by the court of common pleas in the *exercise of its discretion* regarding the eligibility of an offender or regarding postconviction DNA testing under [sections 2953.71 through 2953.81 of the Revised Code] is reviewable by or appealable to any court.

(Emphasis added; language severed as unconstitutional omitted, *see Noling III*, 149 Ohio St.3d 327, 2016-Ohio-8252, 75 N.E.3d 141, at ¶ 60.)

{¶ 32} The text of R.C. 2953.72(A)(8) specifically notes that three of the trial court's *discretionary* decisions regarding DNA testing are appealable: (1)

9

whether Noling is an eligible offender, (2) whether Noling's application satisfied the acceptance criteria, and (3) whether Noling's application should have been accepted or rejected. As a result, appellate courts do not have jurisdiction to hear Noling's claims that appeal *discretionary* decisions made by the trial court that do not relate to one of these three specifically listed exceptions. R.C. 2953.72 (A)(8) does not recognize any limits as to an applicant's right to appeal a court's failure to fulfill a mandatory duty; in fact, the division is entirely silent on that issue.

**{¶ 33}** Had the legislature intended to place limits on the appealability of the trial court's failure to fulfill mandatory duties, the legislature would not have included the phrase "in the exercise of its *discretion*" in R.C. 2953.72(A)(8). To rule that R.C. 2953.72(A)(8) limits the rights of an applicant to appeal the mandatory duties of the trial court, this court would have to delete those words from the statute. " 'It is the duty of this court to give effect to the words used [in a statute], not to delete words used or to insert words not used.' " (Emphasis omitted; brackets added in *Bernardini*.) *Bernardini v. Conneaut Area City School Dist. Bd. of Edn.*, 58 Ohio St.2d 1, 4, 387 N.E.2d 1222 (1979), quoting *Columbus-Suburban Coach Lines v. Pub. Util. Comm.*, 20 Ohio St.2d 125, 127, 254 N.E.2d 8 (1969).

**{¶ 34}** R.C. 2953.72(A)(9) provides that offenders must acknowledge that

> an offender who participates in any phase of the mechanism contained in [R.C. 2953.71 through 2953.81] * * * does not gain as a result of the participation any constitutional right to challenge, or, except as provided in division (A)(8) of this section, any right to any review or appeal of, the *manner* in which those provisions are carried out.

(Emphasis added).

10

**{¶ 35}** The plain text of R.C. 2953.72(A)(9) focuses on appeals of the *manner* in which R.C 2953.71 through 2953.81 are carried out. "Manner" means "the mode or method in which something is done or happens." *Webster's Third New International Dictionary* (2002). Obviously, not carrying out a task is not a mode or method of carrying out that task. Thus, giving effect to the plain text of the statute, R.C. 2953.72(A)(9) recognizes limits to the review on appeal of *the manner* in which a provision has been carried out but does not denote any limits to the review on appeal of *whether* a provision has been carried out.

**{¶ 36}** To rule otherwise would violate the canon of statutory construction that "[n]o part [of a statute] should be treated as superfluous unless that is manifestly required, and the court should avoid that construction which renders a provision meaningless or inoperative." *State ex rel. Myers v. Spencer Twp. Rural School Dist. Bd. of Edn.*, 95 Ohio St. 367, 373, 116 N.E. 516 (1917); s*ee also In re Foreclosure of Liens for Delinquent Land Taxes v. Parcels of Land Encumbered with Delinquent Tax Liens*, 140 Ohio St.3d 346, 2014-Ohio-3656, 18 N.E.3d 1151, ¶ 12. To decide that this court has jurisdiction to rule on only the three discretionary appealable issues listed in R.C. 2953.72(A)(8) would render R.C. 2953.72(A)(9)'s language "the manner in which those provisions are carried out" superfluous. In fact, such a ruling would essentially delete that language altogether. As noted above, the court should not delete words from a statute; it should give effect to all the words used. *Bernardini*, 58 Ohio St.2d at 4, 387 N.E.2d 1222, citing *Columbus-Suburban Coach Lines*, 20 Ohio St.2d at 127, 254 N.E.2d 8.

**{¶ 37}** Examining the limits explained in R.C. 2953.72(A)(8) and (A)(9) in conjunction, it is clear that an appellate court has jurisdiction over a claim raised by an offender who requests DNA testing if the claim challenges any of the three discretionary decisions specifically listed as appealable in R.C. 2953.72(A)(8) or if the claim is that the trial court failed to fulfill a mandatory duty. Appellate courts do not have jurisdiction over claims that the trial court made incorrect discretionary

11

decisions—other than the three specifically listed appealable issues—or claims asserting that the trial court performed a mandatory duty but that the manner in which that duty was performed was improper.

{¶ 38} As noted above, in *Noling III*, we held that R.C. 2953.73(E)(1) denied equal protection under the United States and Ohio Constitutions as it denied capital defendants a right of appeal conferred upon noncapital defendants when the defendant's application for DNA testing was rejected. *Noling III*, 149 Ohio St.3d 327, 2016-Ohio-8252, 75 N.E.3d 141, at ¶ 64. We excised the unconstitutional provisions of the statute, thus providing an appeal of right to this court for capital offenders. *Id*. We also noted that R.C. 2953.72(A) is meant to provide a summary of the statutory scheme and excised the same offending language from R.C. 2953.72(A)(8) that we excised from R.C. 2953.73(E)(1). *Noling III* at ¶ 60.

{¶ 39} In *Noling III*, the majority held that R.C. 2953.72(A)(8) and (A)(9) should not be struck in their entirety. The court reasoned that doing so would broadly expand the appellate rights provided to petitioners by the statutes. *Noling III* at ¶ 63. Here, we do not expand the appellate rights provided by the statutes as warned against in *Noling III*. Instead, we interpret the statutes to determine which appellate rights applicants are entitled to under the statutory scheme.

**B. Request for NIBIN testing of the shell casings (proposition of law No. II)**

{¶ 40} Noling argues that the trial court erred by denying the defense's request to send the shell casings to NIBIN for testing.

{¶ 41} Noling's motion to amend his second application sought submission of the shell casings and bullets to NIBIN for a possible match with the missing murder weapon. The state objected on grounds that the request was unrelated to Noling's motion to amend his application for DNA testing. The trial court denied the request, because "there is no Ohio statutory procedure to submit the shell casings to NIBIN for comparison."

{¶ 42} There is no provision in the DNA-testing statutes—or in any other statute—that would require the court to order that the shell casings be tested by NIBIN. Thus, the trial court's decision whether to order the testing was, at most, discretionary; ordering NIBIN testing was certainly not a mandatory duty. That discretionary decision is not included as one of the three discretionary decisions that are appealable pursuant to R.C.2953.72(A)(8). This court does not have jurisdiction to review the claim, and we dismiss proposition of law No. II accordingly.

### C. Selection of the testing authority (proposition of law No. III)

{¶ 43} Noling argues that the trial court erred in directing BCI to examine the shell casings and ring boxes after he objected to BCI as the testing authority pursuant to R.C. 2953.78(B).

### 1. Background

{¶ 44} Following Noling's request to test the shell casings and ring boxes, the trial court issued the December 19 order instructing the prosecutor and BCI to prepare findings regarding the "the quantity and quality of the parent sample of biological material, found at the crime scene." *See* R.C. 2953.76 (after an application for DNA testing is submitted, prosecutor shall consult with the testing authority and prepare findings regarding the quantity and quality of the parent sample requested for testing).

{¶ 45} Noling moved to stay the trial court's order, arguing that Cellmark, not BCI, should be designated as the testing authority. Noling argued that BCI lacked "the most advanced scientific technologies capable of providing this Court with the best quantity and quality of information."

{¶ 46} Following a hearing, Noling invoked R.C. 2953.78(B) and requested that the trial court "withdraw its decision to grant DNA testing of the shell casings and the ring boxes and enter an order denying [his] Amended DNA Application in its entirety."

13

**{¶ 47}** R.C. 2953.78 specifies:

(A) If an eligible offender submits an application for DNA testing under [R.C. 2953.73] and *if the application is accepted and DNA testing is to be performed*, the court shall select the testing authority to be used for the testing. A court shall not select or use a testing authority for DNA testing unless the attorney general approves or designates the testing authority pursuant to division (C) of this section and unless the testing authority satisfies the criteria set forth in [R.C. 2953.80].

(B) *If a court selects a testing authority pursuant to division (A) of this section and the eligible offender for whom the test is to be performed objects to the use of the selected testing authority, the court shall rescind its prior acceptance of the application for DNA testing for the offender and deny the application.*

\* \* \*

(D) The attorney general's approval or designation of testing authorities \* \* \* do[es] not afford an offender any right to subsequently challenge the approval, designation, selection, or use, and an offender may not appeal to any court the approval, designation, selection, or use of a testing authority.

(Emphasis added.)

**{¶ 48}** The state contended that Noling's request was premature, because the trial court had not accepted the amended application for DNA testing.

**{¶ 49}** Thereafter, the trial court vacated the December 19 order and issued the following order:

*In order to determine whether to accept the Defendant's amended application* for DNA testing, the Court must determine the six criteria set forth in [R.C.] 2953.74(C). To determine these items it's * * * ordered, pursuant to [R.C.] 2953.76, that the Prosecuting Attorney and Bureau of Criminal Identification shall prepare findings regarding:

1. The quantity and quality of the parent sample of biological material found at the crime scene in this case;

2. Whether there is a scientifically sufficient quantity of the parent sample to test;

3. Whether the parent sample is so minute or fragile that there's a substantial risk that the parent sample could be destroyed;

4. Whether the parent sample has been degraded or contaminated to the extent that it has become scientifically unsuitable for testing.

It is further ordered that no DNA sample is to be consumed.

(Emphasis added.) Subsequently, BCI reported that it "determined that the samples * * * are contaminated to the extent that they have become scientifically unsuitable for testing." The trial court stated that Noling's amended application could not be accepted and dismissed it.

## 2. Analysis

{¶ 50} Noling argues that the trial court erred by ordering BCI to conduct testing on the shell casings and ring boxes after he objected to BCI as the testing authority. In response, the state argues that R.C. 2953.78(D) does not allow Noling to appeal the trial court's selection of BCI as the testing authority. However, R.C. 2953.78(D) is inapplicable because it applies only to the selection of the testing

15

authority *after* an offender's DNA application has been accepted, and has no effect on the process for determining *whether* the application should be granted.

{¶ 51} After Noling submitted his amended application, R.C. 2953.76 instructed the trial court to require the prosecuting attorney to consult with a testing authority to make the preliminary determination regarding the quantity and quality of biological material on the shell casings and ring boxes. And under R.C. 2953.74(C)(2), the trial court could accept Noling's application only if the testing authority made certain findings as to the quantity and quality of the sample to be tested (e.g., that there was scientifically sufficient material to extract, that the sample was not so minute or fragile as to risk destruction of the sample, and that the sample was not degraded or contaminated).

{¶ 52} Nothing in the statutory scheme limited the trial court's authority to appoint BCI to make those preliminary findings. Only after these preliminary findings have been made and *after* a trial court has accepted an application for DNA testing can an applicant object to the testing authority selected to complete that testing and require the court to rescind its prior acceptance of the application. *See* R.C. 2953.78(B).

{¶ 53} Noling asserts that the trial court decided that DNA testing was necessary and ordered the process to begin. This assertion is not supported by the record: the trial court issued an order dismissing Noling's amended application on June 27, 2014.

{¶ 54} Under R.C. 2953.76, the court had a mandatory duty to require the prosecuting attorney to consult with the testing authority to determine if the sample could be tested. Noling does not argue that the court failed to fulfill that duty. Noling does claim that the trial court erred in not rescinding its order requiring BCI to examine the shell casings and ring boxes to determine the quantity and quality of biological material available after he objected to BCI as the testing authority. The trial court did not have a mandatory duty to rescind its order; at best, the trial

16

court had the discretion to rescind the order. Because Noling's claim challenges a discretionary decision by the trial court and that discretionary decision is not one of the three specifically listed discretionary decisions that can be appealed under R.C. 2953.72(A)(8), this court does not have jurisdiction to rule on Noling's third proposition of law, and the claim is dismissed accordingly.

## D. Reasons for selection of the testing authority (proposition of law No. V)

{¶ 55} Noling argues that because he contested the selection of BCI as the testing authority, the trial court was required to articulate its reasons for selecting BCI. Noling contends that the trial court's findings should have included the following factors: (1) the technology available at the laboratory, (2) the length of time the technology has been in use at the laboratory, (3) whether the laboratory works on postconviction or cold cases, (4) the laboratory's experience obtaining results from the type of evidence involved in this case, and (5) the laboratory's experience with the use of a particular type of DNA technology.

{¶ 56} Nothing in the DNA-testing statutes requires the trial court to articulate the basis for its selection on the record. The statutes "vest considerable and wide latitude with the judiciary" upon the filing of an application for DNA testing. *State v. Buehler*, 113 Ohio St.3d 114, 2007-Ohio-1246, 863 N.E.2d 124, ¶ 31. Thus, the trial court did not have a mandatory duty to justify its selection of the testing authority and the court's choice is not an appealable discretionary decision. Noling's fifth proposition of law presents an unappealable claim, and the claim is dismissed accordingly.

## E. Testing authority's determination that shell casings and ring boxes were contaminated (proposition of law No. IV)

{¶ 57} Noling argues that BCI failed to conduct scientific testing and review the chain of custody before determining that the shell casings and ring boxes were contaminated and unsuitable for further DNA testing. This proposition of law is best read as a challenge to the court's rejection of Noling's application for failure

17

to satisfy the acceptance criteria of R.C. 2953.72(A)(4) and 2953.74(C)(2)(c). R.C. 2953.72(A)(8) specifically identifies this challenge to the trial court's discretionary decision as appealable.

## 1. Background

**{¶ 58}** As discussed above in relation to proposition of law No. III, the trial court ordered BCI to examine the shell casings and ring boxes and prepare findings regarding the suitability of the evidence for testing.

**{¶ 59}** Subsequently, BCI reported that "[w]ith regards to [R.C.] 2953.76, BCI has determined that the samples * * * are contaminated to the extent that they have become scientifically unsuitable for testing." BCI stated:

> Visual examination of the [shell casings and ring boxes] showed that case information had been written on the small surface area on the individual casings with a presumed non-sterile pen resulting in a potential source of common DNA contamination on multiple casings. The ring boxes are packaged in a sealed plastic bag in contact with each other. These touch DNA samples were processed previously by latent print and firearms disciplines in a manner that would not minimize contamination. In the latent print section at BCI, superglue fuming and dusting with non-sterile powder and brushes was performed. Non-sterile cotton gloves would have been used to place the casings and ring boxes into the chamber prior to superglue adhesion which is another source of potential contamination * * *. * * * During firearms analysis of the casings after latent print processing, each casing would be handled by the analyst without wearing gloves and held in place on a microscope with non-sterile clay used across many cases.

## 2. Analysis

**{¶ 60}** Noling argues that BCI was required to conduct *scientific* testing of the shell casings and ring boxes before determining that they were contaminated and that BCI's *visual* examination was inadequate.

**{¶ 61}** R.C. 2953.76 describes the testing requirements regarding the "quantity and quality of the parent sample of the biological material collected from the crime scene * * * for which the offender * * * is requesting the DNA testing and that is to be tested." R.C. 2953.76(A) and (B) describe the manner of testing that must be performed:

> (A) The testing authority shall determine whether there is a scientifically sufficient quantity of the parent sample to test and whether the parent sample is so minute or fragile that there is a substantial risk that the parent sample could be destroyed in testing. The testing authority may determine that there is not a sufficient quantity to test in order to preserve the state's ability to present in the future the original evidence presented at trial, if another trial is required. * * *.

> (B) The testing authority shall determine whether the parent sample has degraded or been contaminated to the extent that it has become scientifically unsuitable for testing and whether the parent sample otherwise has been preserved, and remains, in a condition that is suitable for testing. Upon making its determination under this division, the testing authority shall prepare a written document that contains its determination and the reasoning and rationale for that determination * * *.

19

**{¶ 62}** Nothing in R.C. 2953.76(A) and (B) dictates the manner in which the testing authority must determine whether the material is of a sufficient quantity and quality to permit further testing. The appropriate method for making that determination is left to the testing authority. Thus, it was sufficient for BCI to use a visual examination to determine that the shell casings and ring boxes were contaminated and not suitable for further DNA testing. Additionally, BCI's determinations were well supported: the shell casings and ring boxes had been examined previously by latent-print and firearms examiners who had not taken precautions to minimize contamination. Accordingly, we reject Noling's claim that the trial court should have ordered BCI to conduct a scientific examination of the shell casings and ring boxes. Based on the foregoing, we reject proposition of law No. IV.

**F. Disclosure of "the results of the [DNA] testing" (proposition of law No. I)**

**{¶ 63}** Noling argues that the trial court failed to provide him with "the results of the testing" as required under R.C. 2953.81(C). Noling urges us to broadly interpret the meaning of "the results of the testing" such that he should be provided all documentation relating to the DNA testing of the cigarette butt.

**1. Appealability of the issue**

**{¶ 64}** R.C. 2953.81(C) provides that "[t]he court or the testing authority *shall* provide a copy of the results of the testing to the prosecuting attorney, the attorney general, and the subject offender." (Emphasis added.) " 'Shall' means must." *Wilson v. Lawrence*, 150 Ohio St.3d 368, 2017-Ohio-1410, 81 N.E.3d 1242, ¶ 13, citing *Application of Braden*, 105 Ohio App. 285, 286, 148 N.E.2d 83 (1st Dist.1957). "[W]e repeatedly have recognized that use of the term 'shall' in a statute connotes a mandatory obligation unless other language evidences a clear and unequivocal intent to the contrary." *Id*. at ¶ 13, citing *State ex rel. Cincinnati Enquirer v. Lyons*, 140 Ohio St.3d 7, 2014-Ohio-2354, 14 N.E.3d 989, ¶ 28.

**{¶ 65}** There is no indication that the word "shall" in R.C. 2953.81(C) means anything other than "must." The use of the word "shall" demonstrates, therefore, that the subject offender is entitled to "the results of the testing" and that the trial court does not have discretion to deny the subject offender those results. Thus, any limit recognized in R.C. 2953.72(A)(8) on Noling's right to appeal the trial court's discretionary rulings has no effect on his right to appeal if he is denied "the results of the testing." Moreover, the language of R.C. 2953.72(A)(9) does not apply, because Noling's claim is that the court failed to provide him "the results of the testing" as required by R.C. 2953.81(C), not that the manner in which the court provided him the results was improper. Had Noling argued, for example, that he was provided "the results" but that he wanted them provided in a different format, the language of R.C. 2953.72(A)(9) may come in to play. As Noling is not appealing the *manner* in which the provision was carried out, but *whether* the provision was carried out, this court has jurisdiction to hear the claim.

### 2. The meaning of "the results of the testing"

**{¶ 66}** Under R.C. 2953.81(C), Noling must be provided the results of the DNA testing ordered by the trial court. The state provided Noling a "Laboratory Report" that included a "Results" section that informed Noling that the DNA sample on the cigarette butt came from an unknown male. Noling argues that this is insufficient to meet the statutory requirement and requests many additional pieces of information. Noling is correct but only to the limited extent that he is entitled to just one of the many additional pieces of information he requests.

**{¶ 67}** When read in pari materia, the statutory scheme makes clear that R.C. 2953.81(C) mandates that Noling must be provided only the DNA profile that was created by testing the DNA sample from the cigarette butt. Under R.C. 2953.74(E), Noling must be provided the identity of any individual identified as the source of the DNA after "comparing the test results" to the DNA profiles in CODIS. It is illogical to read R.C. 2953.81(C) as requiring the state merely to identify any

21

individuals whose DNA profiles matched the sample, as the state argues, because such a reading would require us to conclude that the state must provide Noling with the same information twice. R.C. 2953.74(E) provides that "the results of DNA testing" must be compared to the DNA profiles in CODIS. The only data that can be compared to any DNA profile in CODIS is another DNA profile. R.C. 2953.71 through 2953.81 use the phrases "the results of DNA testing" or "results of the testing" multiple times. Reading R.C. 2953.81(C) as the state suggests would require substantially different definitions of the phrases "the results of DNA testing" and "the results of the testing" for different provisions in the same statutory scheme.

### a. Background

{¶ 68} R.C. 2953.81 provides:

> If an eligible offender submits an application for DNA testing under section 2953.73 of the Revised Code and if DNA testing is performed based on that application, upon completion of the testing, all of the following apply:
>
> * * *
>
> (C) The court or the testing authority shall provide a copy of *the results of the testing* to the prosecuting attorney, the attorney general, and the subject offender.
>
> (E) The testing authority shall provide a copy of the results of the testing to the court of common pleas that decided the DNA application.

(Emphasis added.)

{¶ 69} BCI provided Noling with a copy of its "Laboratory Report." The laboratory report did not include the DNA profile that was created as a result of the

testing process. The "results" section of that report included the statement that "DNA profiling was performed using the polymerase chain reaction at the short tandem repeat loci" and listed the identified loci. The stated conclusion was that "[t]he DNA profile from the cutting from the cigarette butt (Item 1.1.1.) is from an unknown male." This conclusion informs Noling that there were no hits when the DNA profile created from the sample was run through CODIS.

{¶ 70} Noling argues that R.C. 2953.81(C)'s use of the phrase "the results of the testing" means that he is entitled to more information than was included in the conclusory laboratory report that BCI provided him. He asserts that "the results of the testing" necessarily include everything that is actually obtained by calculation and investigation during the DNA-testing process, including the DNA profile itself, electropherograms, and laboratory notes. In response, the state argues that the court should apply the plain meaning of the word "results" and offers a dictionary definition: "[T]hat which results, outcome, consequence, effect," citing *Webster's Encyclopedic Unabridged Dictionary* 1223 (1996). Based upon this, the state argues that Noling received everything to which he was entitled under the statute and that his request for further information should be denied.

**b. Analysis**

{¶ 71} The phrase "the results of the testing" is not defined in R.C. 2953.81 or elsewhere within the statutes addressing applications for DNA testing. When a statute is unclear and relates to the same subject matter as another statute, we construe them in pari materia "to discover and carry out legislative intent." *Sheet Metal Workers' Internatl. Assn., Local Union No. 33 v. Gene's Refrig., Heating & Air Conditioning, Inc.*, 122 Ohio St.3d 248, 2009-Ohio-2747, 910 N.E.2d 444, ¶ 38, citing *State ex rel. Ellis Super Valu, Inc. v. Indus. Comm.*, 115 Ohio St.3d 224, 2007-Ohio-4920, 874 N.E.2d 780, ¶ 13. Construing R.C. 2953.71 through 2953.81 in pari materia provides a clear meaning for the phrase "the results of the testing."

23

### i. "Results of the testing" means the same as "results of DNA testing"

{¶ 72} R.C. 2953.74(E) provides:

> If an eligible offender submits an application for DNA testing under section 2953.73 of the Revised Code and the court accepts the application, the eligible offender may request the court to order, or the court on its own initiative may order, the bureau of criminal identification and investigation to compare *the results of DNA testing* of biological material from an unidentified person other than the offender that was obtained from the crime scene or from a victim of the offense for which the offender has been approved for DNA testing to the combined DNA index system maintained by the federal bureau of investigation.
>
> If the bureau, upon comparing *the test results* to the combined DNA index system, determines the identity of the person who is the contributor of the biological material, the bureau shall provide that information to the court that accepted the application, the offender, and the prosecuting attorney.
>
> If the bureau, upon comparing *the test results* to the combined DNA index system, is unable to determine the identity of the person who is the contributor of the biological material, the bureau may compare *the test results* to other previously obtained and acceptable *DNA test results* of any person whose identity is known other than the eligible offender. If the bureau, upon comparing *the test results* to *the DNA test results* of any person whose identity is known, determines that the person whose identity is known is the contributor of the biological material, the bureau shall provide that information to the court that accepted the application, the offender,

24

and the prosecuting attorney. The offender or the state may use the
information for any lawful purpose.

(Emphasis added.)

**{¶ 73}** R.C. 2953.74(E) demonstrates that the terms "DNA test" and "the
test" appear in conjunction and are used interchangeably in R.C. 2953.71 through
2953.81. Indeed, other statutes within the DNA-testing scheme also use "the test"
or "the testing" to refer to a DNA test. *See, e.g.*, R.C. 2953.72(A) ("Any eligible
offender who wishes to request *DNA testing* under sections 2953.71 to 2953.81 of
the Revised Code shall submit an application for *the testing* to the court of common
pleas * * *" [emphasis added]). Most importantly, the statute at issue, R.C.
2953.81, uses both terms to refer to the same test: "If an eligible offender submits
an application for *DNA testing* under section 2953.73 of the Revised Code and if
*DNA testing* is performed based on that application, upon completion of *the testing*,
all of the following apply * * *." (Emphasis added.) Therefore, the two phrases,
"results of DNA testing" and "results of the testing," refer to the same test results.

**{¶ 74}** Arguments that the two slightly-different phrases have different
meanings are unpersuasive; the presumption of consistent usage "readily yields" to
context. *See Environmental Defense v. Duke Energy Corp.*, 549 U.S. 561, 574, 127
S.Ct. 1423, 167 L.Ed.2d 295 (2007). Reading R.C. 2953.71 through 2953.81 in
context supports our conclusion that the two phrases refer to the same test "results."

### ii. A statute should not be read in a way that makes provisions superfluous

**{¶ 75}** No part of a statute should be treated as superfluous. *In re
Foreclosure of Liens for Delinquent Land Taxes*, 140 Ohio St.3d 346, 2014-Ohio-
3656, 18 N.E.3d 1151, at ¶ 12. We also must avoid "absurd results" when
construing a statute. *State ex rel. Asti v. Dept. of Youth Servs.*, 107 Ohio St.3d 262,
2005-Ohio-6432, 838 N.E.2d 658, ¶ 28.

**{¶ 76}** R.C. 2953.81(E) states that "[t]he testing authority shall provide a copy of the results of the testing to the court of common pleas that decided the DNA application." R.C. 2953.81(C) states that "[t]he court or the testing authority shall provide a copy of the results of the testing to the prosecuting attorney, the attorney general, and the subject offender."

**{¶ 77}** R.C. 2953.74(E) separately states that if the comparison of the test results with the profiles in CODIS yields the identity of the contributor of the sample DNA, "the bureau shall provide [the identity of the contributor] to the court that accepted the application, the offender, and the prosecuting attorney." (Because R.C. 2953.74(E) mandates that the identity of any individual in CODIS whose DNA matches the sample be provided to the court, the offender, and the prosecutor, if BCI does not provide the identity of a CODIS match, the profile from the DNA sample logically must be that of an unknown person.)

**{¶ 78}** R.C. 2953.74(E) would be superfluous if R.C. 2953.81's references to providing "the results of the testing" mean providing only a notification of whether the DNA profile from the sample matched a profile in CODIS; two separate statutory provisions would mandate production of the same information. Equally, it is an "absurd result" to read R.C. 2953.74(E) to mandate that the court and the offender be provided the identity of any individual whose DNA profile in CODIS matched the DNA sample's profile when that information was already necessarily provided under R.C. 2953.81(C) and (E).

### iii. R.C. 2953.74(E) is workable only if "the results of DNA testing" can be compared to the DNA profiles maintained in CODIS

**{¶ 79}** R.C. 2953.74(E) provides that "the results of DNA testing" will be run through CODIS for purposes of a comparison. The only "results" that can be compared to the DNA profiles in CODIS are other DNA profiles. In other words, the specific text of R.C. 2953.74(E) compels the conclusion that "the results of DNA testing" means the DNA profile created by the testing process for purposes

26

of running a comparison in CODIS. Any other definition of "the results of DNA testing" renders R.C. 2953.74(E) unworkable.

**iv. Each section of R.C 2953.71 through 2953.81 is workable if "results of the testing" means the DNA profile created for purposes of a comparison with CODIS**

{¶ 80} Phrases such as "results of DNA testing" and "results of the testing" are used throughout R.C. 2953.71 through 2953.81. Each use of such a term is consistent with reading the phrase "the results of the testing" to mean the DNA profile created for purposes of a comparison with CODIS. *See, e.g.*, R.C. 2953.71(G), (I), (J), and (L); R.C. 2953.72(A)(5), (6), and (9); R.C. 2953.74(A), (B)(1), (C)(4), (C)(5), and (E); R.C. 2953.81(A) through (F).

### c. Conclusion regarding proposition of law No. I

{¶ 81} For these reasons, we reject Noling's argument that R.C. 2953.81(C) entitles him to *all* of the additional documentation that he has requested. Similarly, we reject the state's argument that R.C. 2953.81(C) requires that the trial court or BCI provide Noling only with the conclusory information that the sample came from an "unknown male." Reading the statutory scheme in pari materia, R.C. 2953.81(C) mandates that the trial court or BCI provide Noling with only a copy of the DNA profile created using the DNA sample taken from the cigarette butt. Thus, and only to this limited extent, we agree with the arguments raised in Noling's proposition of law No I and hold that R.C. 2953.81(C) mandates that a subject offender be provided only the DNA profile created for the purpose of a comparison with the DNA profiles in CODIS. To the extent that Noling seeks other additional documents, proposition of law No. I is rejected.

### III. CONCLUSION

{¶ 82} The judgment of the trial court is affirmed in part and reversed in part. We remand this case to the trial court for it to ensure that Noling is provided only the DNA profile created by BCI for purposes of running a comparison with

CODIS, that is, to ensure that Noling is provided "the results of the testing" under R.C. 2953.81(C). Aside from this one limited exception, we affirm the judgment of the trial court.

Judgment affirmed in part<br>
and reversed in part,<br>
and cause remanded.

O'CONNOR, C.J., and O'DONNELL, FRENCH, and KLATT, JJ., concur.

DEWINE, J., concurs in part and dissents in part, with an opinion joined by KENNEDY, J.

WILLIAM A. KLATT, J., of the Tenth District Court of Appeals, sitting for O'NEILL, J.

_____

**DEWINE, J., concurring in part and dissenting in part.**

{¶ 83} I write separately because I disagree with the majority's decision that Tyrone Noling may appeal the trial court's determination of what constitutes "the results" of the DNA testing.

{¶ 84} This case involves a legislatively created procedure under which an offender may obtain postconviction DNA testing by order of the trial court in limited circumstances. Because of the special nature of this procedure, there is no general grant of appellate jurisdiction to challenge a trial court's determination. Rather, the only right to appeal is that which is set forth specifically in the statute at issue, R.C. 2953.72(A)(8). That provision allows an offender to appeal only certain trial-court determinations. Noling claims the trial court provided him with testing results that were more narrow in scope than those R.C. 2953.81(C) entitles him to, but the court's decision about what constitutes "the results of the testing" does not fall within the limited number of trial-court determinations from which the legislature has authorized an appeal. As a consequence, this court lacks jurisdiction to consider Noling's appeal on that issue.

**{¶ 85}** I therefore dissent from the majority's holding ordering the trial court to provide Noling with additional testing results. I concur in the majority's disposition of the other issues raised by Noling.

*The right to appeal is limited by R.C. 2953.72(A)(8) and (A)(9)*

**{¶ 86}** "The right to file a postconviction petition is a statutory right, not a constitutional right," *State v. Broom*, 146 Ohio St.3d 60, 2016-Ohio-1028, 51 N.E.3d 620, ¶ 28, and "a petitioner receives no more rights than those granted by the statute," *State v. Calhoun*, 86 Ohio St.3d 279, 281, 714 N.E.2d 905 (1999). Any right of appeal must emanate from the statutory scheme created by the General Assembly. The specific trial-court determinations subject to appeal are set forth in R.C. 2953.72(A)(8). That statute provides that

> the court of common pleas has *the sole discretion subject to an appeal as described in this division to determine whether an offender is an eligible offender and whether an eligible offender's application for DNA testing satisfies the acceptance criteria described in division (A)(4) of this section and whether the application should be accepted or rejected*, that if the court of common pleas rejects an eligible offender's application, the offender may ~~seek leave of the supreme court to~~ appeal the rejection ~~to that court if the offender was sentenced to death for the offense for which the offender is requesting the DNA testing and, if the offender was not sentenced to death for that offense, may appeal the rejection to the court of appeals~~, and that *no determination otherwise made by the court of common pleas in the exercise of its discretion regarding the eligibility of an offender or regarding postconviction DNA testing under [R.C. 2953.71 to 2953.81] is reviewable by or appealable to any court*.

(Emphasis added; struck-through portions excised from the statute by this court in *State v. Noling*, 149 Ohio St.3d 327, 2016-Ohio-8252, 75 N.E.3d 141, ¶ 60 ("*Noling III*").)

**{¶ 87}** R.C. 2953.72(A)(9) makes clear that the grant of the right to appeal comes exclusively from R.C. 2953.72(A)(8):

> [A]n offender who participates in any phase of the mechanism contained in [R.C. 2953.71 to 2953.81] * * * does not gain as a result of the participation any constitutional right to challenge, or, *except as provided in division (A)(8) of this section*, any right to any review or appeal of, the manner in which those provisions are carried out.

(Emphasis added.)

**{¶ 88}** Thus, R.C. 2953.72(A)(8) grants to the common pleas court the "sole discretion" to make three determinations—(1) "whether an offender is an eligible offender," (2) whether an application "satisfies the acceptance criteria," and (3) "whether the application should be accepted or rejected"—and makes those determinations "subject to an appeal as described in this division."

**{¶ 89}** The right of appeal is "described" later in R.C. 2953.72(A)(8); in setting forth what is subject to appeal, R.C. 2953.72(A)(8) states that "if the court of common pleas rejects an eligible offender's application, the offender may * * * appeal the rejection." Thus, if the offender's application is rejected, he may appeal the three discretionary determinations set forth above. Those are the only determinations subject to appeal, and they can be appealed only when the application is rejected.

**{¶ 90}** After setting forth what may be appealed, the statute sets forth a further limitation on the grant: "[N]o determination otherwise made by the court of

30

common pleas in the exercise of its discretion regarding the eligibility of an offender or regarding postconviction DNA testing under those provisions is reviewable by or appealable to any court." *Id.* The statute thus ordains that determinations other than those that result in a rejection of an offender's application are not appealable. In other words, if in the exercise of its discretion, the court determines that the offender is an "eligible offender," that the offender's application meets the acceptance criteria, or that the application should be accepted, the state has no right of appeal regarding those determinations. This construction is consistent with our recognition in *Noling III*, 149 Ohio St.3d 327, 2016-Ohio-8252, 75 N.E.3d 141, at ¶ 56, that "the legislature clearly intended to eliminate the state's appellate right when it drafted R.C. 2953.73 and gave appellate rights only to offenders." (We held in *Noling III* that R.C. 2953.73(E) grants the appellant the right to appeal the court's rejection of an application pursuant to its determination under R.C. 2953.73(D). *Noling III* at ¶ 64.)

*The majority minimizes the limited grant of appealability*

{¶ 91} Here is where the majority goes wrong: it minimizes the grant of appealability (the identification of the only three determinations that may be appealed) and skips right to the limitation. It takes the limitation's description of what's not appealable—"no determination otherwise made by the court of common pleas in the exercise of its discretion regarding the eligibility of an offender or regarding postconviction DNA testing"—and transforms that language into the grant of additional appealable issues. That's not how the statute works.

{¶ 92} In the majority's view, the words "in the exercise of its discretion" are controlling. So it reads the statute as allowing the appeal of any decision of the common pleas court regarding DNA testing that does not call for an exercise of discretion. That is, an applicant may appeal anything that involves the failure of the trial court to fulfill a mandatory duty. But the statute doesn't say that. Read in its entirety, the statute makes clear that the only determinations that are appealable

31

are the three enumerated in R.C. 2953.72(A)(8) and that those determinations are appealable only when they result in the rejection of an application. A determination "otherwise made by the court," i.e., other than rejection, is not appealable even when it involves the court's discretion.

{¶ 93} The fact that the statute illustrates what is not appealable does not expand what *is* appealable beyond the three enumerated issues. Saying that something is not appealable does not, in effect, make everything else appealable. But that is how the majority reads the statute.

{¶ 94} The majority makes the same mistake construing R.C. 2953.72(A)(9)'s admonition that "except as provided in division (A)(8)," an offender has no right to appeal the "the manner" in which the provisions of R.C. 2953.71 to 2953.81 are carried out. Under a plain reading, the sentence simply serves as a reiteration of the statutory scheme's limits on appealability: there is no right to appeal the manner in which a provision is carried out other than regarding the three appealable determinations identified in R.C. 2953.72(A)(8). The majority, however, twists this limitation into a license to appeal anything that does not have to do with the manner in which a provision is carried out. What the majority fails to explain is how saying someone has no right to appeal one thing can be read as a grant of the right to appeal everything else. Indeed, the majority is unable to point to any provision in the statutory scheme that states an offender may appeal the court's failure to perform a mandatory duty. That's because the statute provides no such right of appeal.

*Mandamus provides eligible offenders an avenue of relief from a court's failure to perform mandatory duties*

{¶ 95} This is not to say that an offender would have no relief in cases in which the court refused to perform a statutory duty. "[A] writ of mandamus may require an inferior tribunal to exercise its judgment or to proceed to the discharge of its function." *State ex rel. Ney v. Niehaus*, 33 Ohio St.3d 118, 119, 515 N.E.2d

32

914 (1987); *accord* R.C. 2731.03. Thus, if a common pleas court failed to exercise its judgment or discharge a function under the statutory scheme, an eligible offender could seek relief in mandamus.

Noling III *recognizes the limited scope of review*

**{¶ 96}** Remarkably, the majority's broad reading of R.C. 2953.72(A)(8) and (A)(9) is directly contrary to what this court said just over a year ago in *Noling III*. There, rejecting the dissent's assertion that R.C. 2953.72(A)(8) and (A)(9) should be severed from the statutory scheme, the majority wrote:

> R.C. 2953.72(A)(8) and (A)(9) closely circumscribe the issues that an offender may raise on appeal. The dissent, by excising (A)(8) and (A)(9), and therefore implicitly seating the appellate right in R.C. 2505.03, would broadly expand the rights of offenders to appeal any final order or judgment of the court in relation to their application for postconviction DNA testing and to seek review of any element of the decision with which the offender disagrees. The legislature plainly intended, through R.C. 2953.72(A)(8) and (A)(9), to limit what findings a court could review on appeal. The dissent's remedy would frustrate that intent, violating [this court's severance test set forth in] *Geiger* [*v. Geiger*, 117 Ohio St. 451, 160 N.E. 28 (1927)] and the dissent's own admonition.

*Noling III*, 149 Ohio St.3d 327, 2016-Ohio-8252, 75 N.E.3d 141, at ¶ 63.

**{¶ 97}** Today, the majority does what this court said it would not do in *Noling III*. It ignores what "[t]he legislature plainly intended" and "broadly expand[s]" the ability of an offender "to seek review of any element of the decision with which the offender disagrees," *id.*, as long as it does not involve the exercise of the court's discretion.

33

*The resolution of this appeal*

{¶ 98} A proper construction of the statutes makes this case an easy one. I concur with the majority's conclusion that Noling's second, third, and fifth propositions of law all assert issues that may not be appealed. That is, they do not concern (1) whether Noling is an eligible offender, (2) whether Noling's application satisfied the acceptance criteria, or (3) whether Noling's application should have been accepted or rejected. I would hold that Noling's first proposition likewise does not fit into that narrow categories of appealable issues and would dismiss that proposition of law also.

{¶ 99} Finally, I concur in the majority's judgment with respect to Noling's fourth proposition of law. Unlike the issues raised in his other propositions, the determinations regarding whether his application failed to satisfy the acceptance criteria and whether his application should have been rejected are both appealable under R.C. 2953.72(A)(8). Like the majority, I would affirm the judgment of the court of appeals on those issues.

KENNEDY, J., concurs in the foregoing opinion.

_____

Victor V. Vigluicci, Portage County Prosecuting Attorney, and Pamela J. Holder, Assistant Prosecuting Attorney, for appellee.

Ohio Innocence Project, Brain Howe, and Mark A. Godsey; and Timothy Young, Ohio Public Defender, and Carrie Wood, Assistant Public Defender, for appellant.

_____