[Cite as *State v. Warren*, 2022-Ohio-4743.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 29393 |
| | : | |
| v. | : | Trial Court Case No. 1994-CR-3533 |
| | : | |
| RAYMOND WARREN | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

## O P I N I O N

Rendered on the 29th day of December, 2022.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
     Attorney for Plaintiff-Appellee

JOANNA L. SANCHEZ, Atty. Reg. No. 0087717 and PATRICK T. CLARK, Atty. Reg. No. 0094087, Assistant State of Ohio Public Defenders, 250 East Broad Street, Suite 1400, Columbus, Ohio 43215
     Attorneys for Defendant-Appellant

. . . . . . . . . . . .

TUCKER, P.J.

{¶ 1} Raymond Warren appeals from the trial court's denial of his R.C. 2953.73 application for post-conviction DNA testing.

{¶ 2} Warren contends the trial court abused its discretion in (1) finding no evidence to suggest that biological material was collected from the crime scene, (2) accepting the determination of the Miami Valley Regional Crime Laboratory (MVRCL) that three fired shell casings are unsuitable for touch DNA testing, and (3) holding that DNA testing producing an exclusion result would not be outcome determinative in his case.

{¶ 3} We conclude that the trial court did abuse its discretion in finding that it "must accept" the crime laboratory's determination that the shell casings at issue are contaminated and unsuitable for testing. Accordingly, the trial court's judgment denying Warren's application will be reversed and the matter will be remanded for further proceedings.

## I. Background

{¶ 4} A jury found Warren guilty of murder with a firearm specification in 1995, and the trial court imposed an aggregate sentence of 18 years to life in prison. This court affirmed on direct appeal in *State v. Warren*, 2d Dist. Montgomery No. 15202, 1996 WL 612858 (Oct. 25, 1996), overruling assignments of error challenging a suppression ruling and the legal sufficiency of the evidence. In its ruling, this court summarized the evidence at trial as follows:

> Shortly after midnight on July 10, 1994, Wendell Scott Simpson was
> shot three times in his automobile on Kilmer Street in Dayton. Moments
> later, his automobile crashed into the porch of a house on Kilmer. Simpson

died as a result of his gunshot wounds.

Police officers who responded to the scene of the crash received information from a resident of Kilmer Street that Simpson had been seen talking with three young black men on mopeds shortly before the shooting. Approximately an hour after police officers had arrived at the scene, Warren drove down Kilmer Street toward the accident on a moped. Because Warren matched the general description of the young men who were last seen talking with Simpson, Sergeant Larry Grossnickle stopped Warren and asked him if he would be willing to answer some questions. Warren agreed. After answering questions briefly at the scene, Warren was taken to the police station to make a statement.

At the police station, a police evidence technician administered an atomic absorption test ("AA test") on Warren's hands to detect the presence of antimony and barium. The presence of these two uncommon substances on one's hands indicates a high probability that the person has fired a gun, has handled a gun which was fired, or has been "down range" of a weapon which was fired within the previous two to four hours. The police later learned that Warren's right palm had tested positive on the AA test for both substances.

Warren was also interviewed at the police station by Detective Doyle Burke. Warren told Burke that he and two of his friends, whom he identified only as "Tony" and "Chante," had been walking up Kilmer pushing a moped

at around midnight on July 10. Warren stated that a green car had pulled up to them and that the driver had asked about purchasing drugs. "Tony" responded that they did not sell drugs, and the group proceeded up the street. According to Warren, the young men heard gunshots and a crash a few minutes later. Warren was released after making his statement.

Approximately one month after the shooting, police identified and located the two young men who had been with Warren on July 10. "Tony" was identified as Antonio Johnson, and "Chante" was identified as Chante Hunt. Johnson and Hunt each testified at trial that, as they walked up Kilmer Street with Warren on July 10, Warren stopped to talk with a man in a green car after the man called out to him. The two men testified that they had heard shots as they proceeded up the street without Warren, and that Warren had later admitted to them, individually, that he had shot the man in the car. According to Johnson, Warren shot Simpson because Simpson had tried to give him fake money for the second time. Johnson and Hunt also testified that they had each seen Warren with a gun the day before the shooting, and Johnson identified that weapon as a .380 automatic.

Andre Wright and Stanley Williams were the first people to stop at the accident scene the night of July 10. Wright and Williams had been driving in a gold or brown car. Wright testified that they had seen Simpson's car "running" on the porch of a house as they drove down Kilmer Street, and that Simpson had been hanging out the window waving his arm. Wright

and Williams turned their car around after they had passed the house, parked, and approached the car. By this time, Wright testified that Simpson was no longer moving. Wright reached into the car and put it in park. When the engine continued to race, Wright approached the car again and turned off the engine. Like Warren, Wright and Williams were interviewed extensively by police officers the night of the shooting.

The police recovered three spent shell casings in and around Simpson's car. A ballistics expert determined that the shell casings were from .380 caliber bullets and that all three had been fired from the same gun. On the seat of the car, police also found a bundle of fake three-dollar bills wrapped in a couple of real dollar bills.

The defense presented two witnesses, Patricia and John Moreland, who lived in the neighborhood where the shooting occurred and knew Warren prior to the shooting. Patricia Moreland testified that she had heard two gunshots as she returned to her house from a friend's house around midnight on July 10. She testified that she had seen Warren on Randolph Street around the time the shots were fired and that she had seen the green car "speeding" on Kilmer, Lakeview and Adelite Streets. Mrs. Moreland further testified that she had heard the shots, but had not seen Simpson get shot, and that there was no one in the vicinity of Simpson's car when the shots were fired. Mrs. Moreland did not see anyone else on Kilmer Street. Mrs. Moreland stated that she ran into her house when the shots were fired

and did not see or hear the car crash.

John Moreland stated that his wife had returned home around 11:00 or 11:30 on July 9, and that she was at home when they heard a loud crash outside. He also testified that he had seen two men drive by the accident in a brown car, turn around, and park across the street from the house into which the car had crashed. He testified that he had watched these men approach the green car several times and reach inside. He said that the men had not appeared to be helping the driver, that it looked as if they had been searching for something, and that they had reached down by the driver's feet.

*Id.* at *1-2.

{¶ 5} Approximately 17 years after this court affirmed his conviction, Warren sought a new trial based on newly-discovered evidence. His new-trial motion was based on affidavits from Hunt and Johnson recanting their trial testimony. Hunt and Johnson averred that Warren did not kill Simpson and that they had told police otherwise because police threatened to charge them with murder. Warren later amended and supplemented his new-trial motion to include an additional affidavit from Johnson averring that he did not tell the truth after Warren's trial because he feared being charged with perjury. Warren also included a publication challenging the reliability of gunshot-residue evidence.

{¶ 6} As ordered by this court, the trial court ultimately held a hearing on Warren's motion for leave to file a new-trial motion. During the three-day hearing, Warren presented testimony from numerous witnesses. They included a firearms expert who testified about

shortcomings in using gunshot-residue testing to determine whether someone fired a gun. Based on the evidence presented, the trial court overruled Warren's motion for leave to file a new-trial motion. The trial court found that he had failed to establish having been unavoidably prevented from obtaining the evidence upon which his motion relied within the time required by law and that his delay in seeking a new trial was unreasonable. This court affirmed on appeal in *State v. Warren*, 2d Dist. Montgomery No. 28092, 2019-Ohio-3522.

{¶ 7} Thereafter, Warren filed a June 15, 2021 application for post-conviction DNA testing of the three shell casings recovered from the crime scene. In an accompanying memorandum, he argued that he met all of the statutory requirements to have the shell casings tested for "touch DNA." He maintained that an "exclusion result" showing that someone other than him had touched the shell casings would be "outcome determinative" in his case, meaning that no reasonable fact-finder would have found him guilty.

{¶ 8} The trial court denied Warren's application in a January 21, 2022 decision, order, and entry. It found "no evidence to suggest that biological material was collected from the crime scene" for potential DNA testing. It also found that it was required to accept the MVRCL's opinion that the shell casings had been contaminated by being handled and were unsuitable for DNA testing. Finally, the trial court found that a test result excluding Warren as the source of DNA on the shell casings would not be outcome determinative in his case. In the trial court's view, DNA evidence showing that someone else had touched the shell casings and possibly loaded the firearm would not establish who had fired the weapon and, therefore, would not exclude Warren as the shooter.

{¶ 9} Warren timely appealed from the trial court's denial of his application. He argues that the trial court abused its discretion in (1) finding no evidence to suggest that biological material was collected from the crime scene, (2) accepting the MVRCL's determination that the shell casings had been contaminated and were unsuitable for DNA testing, and (3) ruling that a DNA testing exclusion result would not be outcome determinative.

## II. Analysis

{¶ 10} Post-conviction DNA testing is governed by R.C. Chapter 2953. The criteria for a trial court to accept an application for post-conviction DNA testing are found in R.C. 2953.74. As relevant here, the trial court was authorized to accept Warren's application only if (1) the trial court determined that biological material was collected from the crime scene and the parent sample of that biological material still existed, (2) the MVRCL determined, among other things, that the parent sample had not degraded or been contaminated to the extent that it became scientifically unsuitable for testing, and (3) the trial court determined that if DNA testing was conducted and an exclusion result was obtained, the results of the testing would be outcome determinative. R.C. 2953.74(C). The trial court was precluded from accepting Warren's application if any of these requirements was not satisfied. *State v. Emerick*, 170 Ohio App.3d 647, 2007-Ohio-1334, 868 N.E.2d 742, ¶ 16 (2d Dist.).

{¶ 11} The phrase "exclusion result" means a DNA test result "that scientifically precludes or forecloses the subject offender as a contributor of biological material recovered from the crime scene or victim in question, in relation to the offense for which

the offender is an eligible offender[.]" R.C. 2953.71(G). "Outcome determinative" means "that had the results of DNA testing of the subject offender been presented at the trial of the subject offender requesting DNA testing and been found relevant and admissible with respect to the felony offense for which the offender is an eligible offender and is requesting the DNA testing, and had those results been analyzed in the context of and upon consideration of all available admissible evidence related to the offender's case * * *, there is a strong probability that no reasonable factfinder would have found the offender guilty of that offense[.]" R.C. 2953.71(L).

{¶ 12} When assessing whether the outcome-determinative requirement has been satisfied, a trial court must consider "all available admissible evidence related to the subject offender's case." R.C. 2953.74(D). This includes any new evidence available at the time of the application for DNA testing. *State v. Scott*, Ohio Slip Opinion No. 2022-Ohio-4277, __ N.E.3d __, ¶ 15 (considering a post-conviction recantation by a key prosecution witness when evaluating whether an exclusion result would be outcome determinative). A trial court has discretion to accept or reject an application for DNA testing. R.C. 2953.74(A). Thus, absent an abuse of discretion, we will not reverse the trial court's decision. An abuse of discretion occurs when a decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 13} We begin our analysis with Warren's challenge to the trial court's finding of a lack of evidence that biological material was collected from the crime scene. It is undisputed that shell casings were found in or near the victim's vehicle. But shell casings

are not biological material. The Revised Code defines "biological material" as "any product of a human body containing DNA." R.C. 2953.71(B). Biological material may include blood, semen, hair, saliva, and skin tissue. R.C. 2933.82(A)(1)(a)(ii) (defining "biological evidence" as any item containing these products). Therefore, the collection of a shell casing does not necessarily establish the collection of biological material.

{¶ 14} Unlike more obvious types of biological material such as a blood stain, a casual examination of a shell casing may not reveal the existence of skin tissue. We note, however, that under R.C. 2953.75(A), if an eligible offender applies for DNA testing, the prosecuting attorney must "use reasonable diligence to determine whether biological material was collected from the crime scene or victim of the offense for which the offender is an eligible offender and is requesting the DNA testing[.]" In exercising reasonable diligence, the prosecuting attorney shall rely on "all relevant sources," including: "(1) All prosecuting authorities in the case in which the offender was convicted of the offense for which the offender is an eligible offender and is requesting the DNA testing and in the appeals of, and postconviction proceedings related to, that case; (2) All law enforcement authorities involved in the investigation of the offense for which the offender is an eligible offender and is requesting the DNA testing; (3) All custodial agencies involved at any time with the biological material in question; (4) The custodian of all custodial agencies described in division (A)(3) of this section; (5) All crime laboratories involved at any time with the biological material in question; [and] (6) All other reasonable sources." Finally, R.C. 2953.75(B) provides that "[t]he prosecuting attorney shall prepare a report that contains the prosecuting attorney's determinations made under division (A) of this section

and shall file a copy of the report with the court and provide a copy to the eligible offender and the attorney general."

{¶ 15} In the present case, the prosecuting attorney did file the report required by R.C. 2953.75(B). With regard to the existence of biological material, the July 19, 2021 report acknowledges that "*potential* biological material was collected from the scene in the above-captioned case, parent samples of which still exist[.]" (Emphasis added.) The report does not mention any attempt to have the shell casings examined to confirm the presence or absence of biological material for DNA testing. Apparently recognizing that skin tissue cannot be seen with the naked eye, the prosecuting attorney simply referenced "potential biological material" on the shell casings.

{¶ 16} The First District Court of Appeals has recognized that "it is not unreasonable to conclude that skin tissue or other products of the human body containing DNA may be found on inanimate objects such as bullets or shell casings, items that [the defendant] requested be tested for DNA." *State v. Levingston*, 1st Dist. Hamilton No. C-210378, 2022-Ohio-3312, ¶ 13; *see also State v. Gavin,* 2022-Ohio-3027, 195 N.E.3d 226, ¶ 41 (4th Dist.) (citing "expert affidavit stating that there is a reasonable expectation of obtaining informative DNA results should the plastic bag at issue be tested"); *State v. Emerick*, 2d Dist. Montgomery No. 24215, 2011-Ohio-5543, ¶ 56-57 (recognizing that a letter and an envelope may contain biological materials suitable for DNA testing). For present purposes, we will accept that the shell casings qualify as biological material in light of (1) a reasonable inference that someone necessarily touched them to load the firearm, (2) the prosecuting attorney's concession that "potential biological material"

exists, and (3) the apparent absence of any effort by investigative authorities to determine whether skin cells in fact are present on the casings.

**{¶ 17}** The next issue is whether biological material on the shell casings has been contaminated, rendering them unsuitable for touch DNA analysis. The trial court found that the shell casings had been contaminated by being handled without gloves. In reaching this conclusion, it relied exclusively on a July 16, 2021 letter from the lab supervisor and DNA tech leader at the MVRCL to the prosecuting attorney. The letter reads as follows:

> This letter is in response to touch DNA testing and the three fired casings that are referenced in the report issued on August 17, 1994 by Timothy S. Duerr, a forensic scientist employed at the Miami Valley Regional Crime Laboratory.
>
> Because the fired casings were handled without gloves by the firearms examiner at the time of comparison, any DNA that may have been present likely has been obliterated. Additionally, extraneous DNA from the examiner and any other items handled in the relative time period could be sources of contamination. Because the fired cases are no longer in the same condition as found, the items are unsuitable for touch DNA testing.
>
> Please do not hesitate to contact me with any additional questions.

**{¶ 18}** In denying Warren's application for DNA testing, the trial court stated that it "must accept" the MVRCL's determination that the shell casings are unsuitable for testing.

**{¶ 19}** As set forth above, one condition for the trial court's acceptance of an

application for post-conviction DNA testing is a determination *by the testing authority* that "[t]he parent sample of the biological material so collected has not degraded or been contaminated to the extent that it has become scientifically unsuitable for testing[.]" R.C. 2953.74(C)(2)(c). This court has stated that "it is the responsibility of the 'testing authority,' * * * not the trial court, to determine whether the parent sample of the biological evidence collected is of sufficient quantity and in suitable scientific condition to be submitted for testing."[1] *State v. Reynolds*, 186 Ohio App.3d 1, 2009-Ohio-5532, 926 N.E.2d 315, ¶ 15 (2d Dist.).

{¶ 20} We note, however, that another statute, R.C. 2953.76(B), obligates the testing authority to determine, among other things, whether a sample of biological material has been "contaminated to the extent that it has become scientifically unsuitable for testing" and to "prepare a written document that contains its determination and the reasoning and rationale for that determination[.]" Similarly, R.C. 2953.76(C) obligates the trial court itself to determine "whether there is any reason to believe" the biological material "has been tampered with or contaminated" since it was collected. Upon making this determination, "the court shall prepare and retain a written document that contains its determination and the reasoning and rationale for that determination." *Id.*

{¶ 21} In *State v. Noling*, 153 Ohio St.3d 108, 2018-Ohio-795, 101 N.E.3d 435, the

---

[1] At the time of the MVRCL supervisor's July 16, 2021 letter, it appears that the MVRCL conducted DNA testing, making it a "testing authority" under R.C. 2953.71(R) which provides that " 'testing authority' means a laboratory at which DNA testing will be conducted under sections 2953.71 to 2953.81." We are aware that the MVRCL more recently has ceased DNA testing at its facility. *See* Dayton Daily News, July 18, 2022 2022 WLNR 22468007 ("Miami Valley Regional Crime Lab shuts down DNA testing"). At the relevant time, however, the facility qualified as a testing authority.

Ohio Supreme Court recognized that "[t]he appropriate method for making [the suitability for DNA testing] determination is left to the testing authority." *Noling* at ¶ 62. The question in *Noling* was whether a visual examination was sufficient or whether scientific examination was required. The crime-lab representative in *Noling* provided the following detailed explanation for the finding that shell casings were contaminated and unsuitable for testing:

> Visual examination of the [shell casings and ring boxes] showed that case information had been written on the small surface area on the individual casings with a presumed non-sterile pen resulting in a potential source of common DNA contamination on multiple casings. The ring boxes are packaged in a sealed plastic bag in contact with each other. These touch DNA samples were processed previously by latent print and firearms disciplines in a manner that would not minimize contamination. In the latent print section at BCI, superglue fuming and dusting with non-sterile powder and brushes was performed. Non-sterile cotton gloves would have been used to place the casings and ring boxes into the chamber prior to superglue adhesion which is another source of potential contamination * * *. * * * During firearms analysis of the casings after latent print processing, each casing would be handled by the analyst without wearing gloves and held in place on a microscope with non-sterile clay used across many cases.

*Noling* at ¶ 59.

{¶ 22} Upon review, the *Noling* court held that conducting only a visual examination was within the testing authority's discretion. The Ohio Supreme Court proceeded to engage in its own limited review of the testing authority's determination, reasoning:

> * * * [I]t was sufficient for BCI to use a visual examination to determine that the shell casings and ring boxes were contaminated and not suitable for further DNA testing. Additionally, BCI's determinations were well supported: the shell casings and ring boxes had been examined previously by latent-print and firearms examiners who had not taken precautions to minimize contamination. Accordingly, we reject Noling's claim that the trial court should have ordered BCI to conduct a scientific examination of the shell casings and ring boxes.

*Id.* at ¶ 62.

{¶ 23} As in *Noling*, the MVRCL supervisor opined that the shell casings in Warren's case had been contaminated and were unsuitable for testing because they had been handled by a firearms examiner without gloves. If this is true, *Noling* suggests that it constitutes a legitimate basis for denying Warren's application for DNA testing and that the crime laboratory was not required to conduct a scientific examination of the shell casings to determine whether any biological material was suitable for testing.

{¶ 24} Unlike *Noling*, however, the MVRCL supervisor's opinion is not "well supported." There is no indication in the record that anyone from MVRCL went to the trial court property room, where the shell casings are being stored, to conduct any examination, visual or otherwise, in connection with Warren's application. More

importantly, we see nothing in the record to support the one-line assertion in the crime-lab supervisor's July 16, 2021 letter that "the fired casings were handled without gloves by the firearms examiner at the time of comparison."

**{¶ 25}** Warren's trial transcript reflects that the evidence technician who collected the shell casings at the scene wore gloves. *See* March 13, 1995 trial transcript at 54. The 1995 trial transcript does not indicate whether the firearms examiner who subsequently evaluated the casings wore gloves. The July 16, 2021 letter from the MVRCL supervisor to the prosecuting attorney also fails to set forth the supervisor's basis of knowledge regarding the firearms examiner's ungloved status decades ago. Absent an explanation from the crime-lab representative detailing her basis of knowledge or some record evidence establishing that the firearms examiner did not wear gloves, we decline to affirm the trial court's judgment on the basis that the shell casings have been contaminated.

**{¶ 26}** We recognize that R.C. 2953.74(C)(2)(c) places responsibility on the testing authority, not the trial court, to make a determination regarding contamination and suitability for DNA testing. *Reynolds* at ¶ 21. We are unpersuaded, however, that this determination is entirely beyond judicial review. The post-conviction DNA testing statutes implicitly envision some review of the testing authority's determination. As noted above, the testing authority is required to prepare a written document containing its determination and to provide supporting reasoning and a rationale for its decision. R.C. 2953.76(B). The trial court must do likewise. R.C. 2953.76(C).

**{¶ 27}** We discern no purpose in requiring the testing authority to explain its decision if that decision is insulated from any review. *Noling* makes clear that the testing

authority retains discretion in evaluating biological material for potential DNA testing. But in *Noling* itself, the Ohio Supreme Court reviewed the testing authority's determinations and found them to be "well supported." *Noling* at ¶ 62. We note too that allowing the testing authority to make unreviewable decisions regarding contamination and suitability for testing would bestow unchecked veto power over all eligible offenders' applications for DNA testing. Such a scenario would raise potential separation-of-power concerns given the MVRCL's status as an executive-branch actor.[2] *Compare State v. Sterling*, 113 Ohio St.3d 255, 2007-Ohio-1790, 864 N.E.2d 630 (declaring unconstitutional a statute making a prosecutor's disagreement with an application for DNA testing final and not appealable).

{¶ 28} In the present case, the trial court held that it "must accept" the MVRCL's determination that the shell casings were contaminated and unsuitable for DNA testing. This statement by the trial court indicates that it engaged in no meaningful review of the testing authority's determination. Based on the reasoning set forth above, we believe the trial court possessed authority to conduct a limited review of the MVRCL's determination to ensure that the crime lab's conclusion is supported and grounded in fact.[3] Because

---

[2] In response to separation-of-powers concerns, the State maintains that the MVRCL "is not a government agency and is not associated with the executive branch[.]" But a crime lab is identified by statute as a "governmental evidence-retention entity" that is "charged with the collection, storage, or retrieval of biological evidence." R.C. 2933.82(A)(5)(a). Like other governmental actors, a crime lab is subject to public-records requests under R.C. 149.43. *Norris v. Budgake*, 89 Ohio St.3d 208, 2000-Ohio-137, 729 N.E.2d 758. Other jurisdictions have recognized that a crime lab is part of the executive-branch apparatus. *Perdomo v. State*, 565 So.2d 1375, 1376 (Fla. App. 1990); *State v. Arghittu*, 343 P.3d 709, ¶ 32 (Utah App. 2015).

[3] In *Reynolds*, 186 Ohio App.3d 1, 2009-Ohio-5532, 926 N.E.2d 315, we held that the trial court had "overstepped the authority granted to it by the DNA testing statutes" when

the trial court did not conduct this review and because it is not apparent from the record how the crime-lab supervisor knew whether a firearms examiner wore gloves more than 25 years ago, we believe the proper course of action is to remand the case to the trial court to resolve the issue in the first instance.

{¶ 29} Having found a remand necessary for the trial court to review the crime laboratory's conclusion about the shell casings' suitability for DNA testing, we need not at this time proceed to the third step and decide whether a potential DNA test result excluding Warren as the source would be outcome determinative. If the trial court finds on remand that the shell casings in fact were contaminated, that finding alone would be a sufficient basis for denying his application. Therefore, until the trial court properly determines whether uncontaminated biological material exists for testing, there is no point in proceeding to the next step. Whether an exclusion result following DNA testing would be outcome determinative is a moot point if the shell casings are contaminated. Under that scenario, any opinion we might render about DNA testing being outcome determinative would be hypothetical. Moreover, at this point, even if we were to find that an exclusion result would be outcome determinative, a remand still would be necessary for the trial court to determine whether the shell casings are suitable for DNA testing.

### III. Conclusion

{¶ 30} Based on the reasoning set forth above, we sustain Warren's sole

---

it independently evaluated the evidence and drew its own negative conclusions regarding the suitability of biological material for DNA testing. *Reynolds* at ¶ 21. But in the present case we are not suggesting that the trial court may or should substitute its judgment for that of the MVRCL. We conclude only that the trial court is permitted to review the MVRCL's contamination determination to ensure that it has some basis in fact.

assignment of error insofar as the trial court erred in holding that it "must accept" the MVRCL's determination that the shell casings at issue were contaminated and unsuitable for DNA testing.

{¶ 31} The trial court's judgment denying Warren's application for post-conviction DNA testing is reversed, and the case is remanded to the trial court to review the MVRCL's determination to ensure that the crime lab's conclusion is supported and grounded in fact. We leave to the trial court's discretion whether and how to take additional evidence on the issue.

. . . . . . . . . . . . .

EPLEY, J. and LEWIS, J., concur.


Copies sent to:

Mathias H. Heck, Jr.
Andrew T. French
Joanna L. Sanchez
Patrick T. Clark
Hon. Mary Katherine Huffman