[Cite as *State v. West*, 2024-Ohio-1103.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

KEVIN WEST,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 23 MA 0098**

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2008 CR 1007

**BEFORE:**
Mark A. Hanni, Carol Ann Robb, Judges,
William A. Klatt, Retired Judge of the Tenth District Court of Appeals,
Sitting by Assignment.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Gina DeGenova*, Mahoning County Prosecutor, and *Atty. Ralph M. Rivera*, Assistant Prosecuting Attorney, Mahoning County Prosecutor's Office, for Plaintiff-Appellee and

Kevin West, *Pro se*, Defendant-Appellant.

Dated:  March 22, 2024

**HANNI, J.**

{¶1} Defendant-Appellant, Kevin West, appeals from a Mahoning County Court of Common Pleas denial of his post-conviction application for DNA testing. For the following reasons, we affirm the trial court's judgment.

{¶2} On August 28, 2008, Appellant was indicted by the Mahoning County Grand Jury for aggravated murder in violation of R.C. 2903.01(A)(F), with a firearm specification under R.C. 2941.145(A). On December 14, 2010, a jury found Appellant guilty as charged and the trial court sentenced him to 30 years to life in prison for aggravated murder, and a consecutive and mandatory term of 3 years in prison for the firearm specification.

{¶3} Appellant appealed his conviction and sentence. He challenged the trial court's denial of his motion to suppress pretrial identifications of him via a photographic array. He also asserted that his convictions were against the manifest weight of the evidence and trial court erred in imposing post-release control.

{¶4} In our Opinion addressing his appeal, we set forth the following Statement of the Case:

> The testimony established that the victim, Delbert Jones, was at home with his children's mother, Samantha Miller. When their friends, Latuwanda Scott and Diane Langston, pulled up to the curb in front of the house, the victim and Ms. Miller went out to speak to them. A vehicle drove past. Ms. Miller testified that prior to that day, she had never seen the driver whom the victim called "Kevin." (Tr. 333-334, 344).
>
> Ms. Scott testified that the victim said to her, "there's your cousin riding past * * * Kevin." Ms. Scott also explained that appellant, Kevin West, is her cousin's brother. (Tr. 380, 382). Within minutes, a young man started walking down the street toward the victim from the direction the vehicle had gone. (Tr. 361). Ms. Langston testified that the victim noticed him and said, "here go your cousin, Kevin." (Tr. 415).
>
> At that point, shots rang out, and the man later started chasing the victim around the vehicle and between the houses with gunshots continuing. (Tr.

334, 339, 385-386). The victim soon collapsed while the gunman stood over him and fired more shots into his body. (Tr. 337-339, 389, 415, 418).

Ms. Scott testified that she recognized appellant as he ran past her car chasing the victim; she also saw appellant stand over the collapsed victim and shoot. (Tr. 384). At that point, she sped away from the scene and soon stopped at a house on another street when she noticed her aunt's car. While discussing the shooting, she then saw appellant jump off his uncle's porch a couple doors down and leave. (Tr. 391). She said he was sweating and wearing the same clothes as the shooter. (Tr. 392, 400-401). She picked him out of a photographic lineup that evening.

Ms. Langston testified that she also realized the shooter was appellant, whom she has known since she was a child, after he chased the victim behind the car in which she was a passenger. (Tr. 416). She too saw him jump off the porch later. (Tr. 420). She picked appellant's photograph out of a lineup as well. (Tr. 421).

Ms. Miller testified that when she heard the shots and saw people running between the houses, she ran into the house to call 911. (Tr. 335-336). She looked out of her window and saw the victim on the ground with someone standing over him pointing down. When shown a photographic lineup, she identified appellant as the person she saw standing over the victim and the person who had driven by just before the shooting. (Tr. 355-356, 402).

The victim's next-door neighbor came forward for the first time. He identified appellant as the young man he saw chasing the victim around his house and then emptying a gun into the collapsed victim. (Tr. 516, 519). He explained he initially refused to speak to police because of the large crowd that had gathered at the scene. He stated that he did not want involved thereafter out of concern for his children and grandchildren. (Tr. 521).

A police officer testified that they found six shell casings at the scene. (Tr. 497). The victim had been shot five times. Two spent slugs were found

under his body, confirming the witnesses' testimony he was shot after he collapsed. It was disclosed that one of the bullets had the victim's initials carved into it.

*State v. West*, 7th Dist. Mahoning No. 11 MA 33, 2012-Ohio-2758, ¶ 6-13.

**{¶5}** On June 13, 2012, we affirmed the trial court's judgment as to Appellant's convictions and the main portion of his sentence. *Id.* at ¶ 50. However, we modified the sentencing judgment to eliminate references to post-release control because aggravated murder was subject to parole rather than post-release control as an unclassified felony. *Id.*

**{¶6}** Appellant appealed to the Ohio Supreme Court, but the Court declined jurisdiction.

**{¶7}** On September 19, 2012, Appellant filed a motion to reopen his appeal, which we denied on October 5, 2012. (Oct. 5, 2012 J.E.). We found the motion untimely and without good cause to excuse the late filing. *Id.*

**{¶8}** On March 22, 2016, Appellant filed a motion for leave to file a motion for a new trial based on newly discovered evidence. He asserted that a witness to the shooting came forward with an affidavit stating that Appellant was not the person that she saw shoot the victim. The trial court denied the motion, and this court affirmed that decision. *See State v. West*, 7th Dist. Mahoning No. 16 MA 131, 2017-Ohio-737. Appellant filed a notice of appeal to the Ohio Supreme Court, but the Court declined jurisdiction on November 16, 2017.

**{¶9}** On May 24, 2023, Appellant filed an application for DNA testing on two spent slugs and six shell casings collected from the crime scene.

**{¶10}** On August 16, 2023, the trial court denied the application. The court held that it had "reviewed the Pleadings and finds that the Defendant has not established that he is an eligible offender to request such testing since the results would not be outcome determinative given the testimony at trial."

**{¶11}** On September 6, 2023, Appellant filed a notice of appeal to this court asserting two assignments of error. In his first assignment of error, Appellant asserts:

Case No. 23 MA 0098

**THE TRIAL COURT ERRED BY ABUSING ITS DISCRETION AND DENIED APPELLANT DUE PROCESS OF LAW AND FUNDAMENTAL FAIRNESS WHEN IT DETERMINED APPELLANT WAS NOT AN ELIGIBLE OFFENDER FOR DNA TESTING BY WRONGFULLY CLAIMING THE RESULTS WOULD NOT BE OUTCOME DETERMINATIVE**.

{¶12} Citing R.C. 2953.74(D) and *State v. Scott*, 171 Ohio St.3d 651, 2022-Ohio-4277, 220 N.E.3d 668, Appellant contends that the trial court was required to consider all available admissible evidence related to his case, including new evidence available at the time of his filing of the application. He also submits that the trial court relied solely on direct examination testimony when much of the incriminating testimony was corrected and countered on cross-examination. He further asserts that the trial court erred by finding him ineligible to file the DNA testing application because the State waived this argument by failing to assert it in its response to his application.

{¶13} Appellant challenges the trial testimony of State witnesses Samantha Miller, Janei Tompkins, Latuwanda Scott, Diane Langston, Marsol Young, and Youngstown Police Department Detective John Kelty. He asserts that the testimony was not overwhelming, especially in light of the cross-examination of these witnesses and the lack of forensic evidence linking him to the crime. Citing *Scott*, Appellant concludes that a strong probability exists that a reasonable factfinder could have found him not guilty of the crimes if he could have presented a DNA test result at trial that excluded his DNA on the shell casings and bullets.

{¶14} We review the trial court's ruling on the application for DNA testing for abuse of discretion. *Scott*, at ¶ 12. Abuse of discretion "implies that the court's attitude is unreasonable, unconscionable, or arbitrary." *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

{¶15} In Ohio, eligible offenders may file post-conviction applications for DNA testing. R.C. 2953.73. An eligible offender is an offender who meets the requirements set forth in R.C. 2953.72(C). R.C. 2953.71(F).

{¶16} R.C. 2953.72(C)(1) provides in relevant part that:

(C)(1) An offender is eligible to request DNA testing to be conducted under sections 2953.71 to 2953.81 of the Revised Code only if all of the following apply:

(a) The offense for which the offender claims to be an eligible offender is a felony, and the offender was convicted by a judge or jury of that offense.

(b) One of the following applies:

(i) The offender was sentenced to a prison term or sentence of death for the felony described in division (C)(1)(a) of this section, and the offender is in prison serving that prison term or under that sentence of death * * *.

**{¶17}** The trial court's judgment entry denying Appellant's application for DNA testing is somewhat confusing. It states that the "Court has reviewed the Pleadings and finds that Defendant has not established that he is an eligible offender to request such testing since the results would not [would not sic] be outcome determinative given the testimony at trial."

**{¶18}** First, the trial court reviewed more than the "pleadings" in denying Appellant's application for DNA testing. Crim. R. 12 provides that, "[p]leadings in criminal proceedings shall be the complaint, and the indictment or information, and the pleas of not guilty, not guilty by reason of insanity, guilty, and no contest." The trial court relied on the trial testimony.

**{¶19}** Second, as Appellant contends, the language of the judgment entry is imprecise. The use of the word "eligible" in its conclusion makes it sound as if the court found Appellant to be an ineligible offender because trial testimony established that DNA results would not be outcome determinative. The entry could be read as "Defendant has *not established that he is an eligible offender to request such testing since the results would not be outcome determinative* given the testimony at trial." [Emphasis added]. Appellant is correct that an outcome determinative determination is not part of the eligible offender qualification under R.C. 2953.72(C)(1), as shown above.

**{¶20}** However, we read the judgment entry to hold that Appellant was an eligible offender, but he was not *an eligible offender entitled to DNA testing* because he could not

establish that DNA test results would be outcome determinative. Further, Appellant devotes nearly the entirety of his argument under this assignment of error to the "outcome determinative" portion of the court's sentence. Accordingly, we interpret the trial court's judgment entry in this manner.

**{¶21}** In reviewing the outcome determinative criteria, the court shall use "the criteria and procedures set forth in sections 2953.74 to 2953.81 of the Revised Code." R.C. 2953.74(D). The court must "consider all available admissible evidence related to the subject offender's case." R.C. 2953.74(D). This includes the application itself, any attached affidavits, the record evidence, and all of the files and records concerning the case against the applicant. R.C. 2953.73(D). A court is not required to hold an evidentiary hearing, but must provide its reasons for accepting or rejecting the application in its judgment order. R.C. 2953.73(D).

**{¶22}** Appellant notes that the trial court failed to cite any statute in rejecting his application, but he speculates that the trial court relied on R.C. 2953.74(B)(1). R.C. 2953.74(B) provides that:

(B) If an eligible offender submits an application for DNA testing under section 2953.73 of the Revised Code, the court may accept the application only if one of the following applies:

(1) The offender did not have a DNA test taken at the trial stage in the case in which the offender was convicted of the offense for which the offender is an eligible offender and is requesting the DNA testing regarding the same biological evidence that the offender seeks to have tested, the offender shows that DNA exclusion when analyzed in the context of and upon consideration of all available admissible evidence related to the subject offender's case as described in division (D) of this section would have been outcome determinative at that trial stage in that case, and, at the time of the trial stage in that case, DNA testing was not generally accepted, the results of DNA testing were not generally admissible in evidence, or DNA testing was not yet available.

Case No. 23 MA 0098

(2) The offender had a DNA test taken at the trial stage in the case in which the offender was convicted of the offense for which the offender is an eligible offender and is requesting the DNA testing regarding the same biological evidence that the offender seeks to have tested, the test was not a prior definitive DNA test that is subject to division (A) of this section, and the offender shows that DNA exclusion when analyzed in the context of and upon consideration of all available admissible evidence related to the subject offender's case as described in division (D) of this section would have been outcome determinative at the trial stage in that case.

**{¶23}** "Outcome determinative" is defined under R.C. 2953.71(L) as:

(L) "Outcome determinative" means that had the results of DNA testing of the subject offender been presented at the trial of the subject offender requesting DNA testing and been found relevant and admissible with respect to the felony offense for which the offender is an eligible offender and is requesting the DNA testing, and had those results been analyzed in the context of and upon consideration of all available admissible evidence related to the offender's case as described in division (D) of section 2953.74 of the Revised Code, there is a strong probability that no reasonable factfinder would have found the offender guilty of that offense * * *.

**{¶24}** In *Scott*, 171 Ohio St.3d 651, 2022-Ohio-4277, 220 N.E.3d at ¶ 14, the Ohio Supreme Court elaborated on the "outcome determinative" standard. The Court held that "the relevant question is not whether the available admissible evidence was enough to convict [the offender]" at trial. *Id.* Rather, the Court explained that:

[t]he relevant question is whether there is a strong probability that no reasonable factfinder would have found Scott guilty of the offenses of assault, rape, and murder if a DNA test result excluding Scott had been presented at trial and analyzed in the context of and upon consideration of all available admissible evidence.

*Id.*; *see also State v. Riley*, 8th Dist. Cuyahoga No. 112302, 2023-Ohio-2588, ¶ 36.

Case No. 23 MA 0098

**{¶25}** The Court held that the exclusion result should be reviewed as to whether it "would create sufficient doubt about key pieces of evidence" or "reduce the weight of other evidence." *Scott, supra,* at ¶ 14, 16. The Ohio Supreme Court further found that "the existence of evidence that also supports a defense theory involving an alternative suspect who could be the contributor is highly relevant to the outcome-determinative standard * * *." *Id.* at ¶ 11.

**{¶26}** In this case, no DNA or fingerprint evidence was presented at trial. There was no gun recovered and the bullets and shell casings recovered at the scene were not tested for DNA or fingerprints. Officer Marzullo of the Youngstown Police Department testified that he was an assistant to the lead crime scene investigator who responded to the scene of the shooting. (Tr. at 469-471). He stated that no testing for DNA was performed on the bullets and shell casings because the heat created from the gunpowder inside of a gun burns off DNA and fingerprints when a bullet is fired from the gun. (Tr. at 482). He stated that he was trained in crime scene investigation and ballistics during his 18-year tenure with the police department. (Tr. at 468-472, 473).

**{¶27}** The trial transcript indicates that the victim's girlfriend, Samantha Miller, testified that she did not see the shooter. (Tr. at 340). She stated that she was in the house with the victim, when Janei Tompkins came in and said that Latuwanda Scott and Diane Langston had pulled up in front of the house. (Tr. at 325). Ms. Miller testified that Ms. Scott was the victim's best friend and she saw the victim walk to the driver's side of the car where Ms. Scott was seated, while she walked to the passenger side where Ms. Langston was seated. (Tr. at 325-326).

**{¶28}** Ms. Miller testified that a burgundy car drove by and the victim stated the name "Kevin" as the car passed. (Tr. at 333). She stated that about 2 or 3 minutes later, as she was walking back up to the house, she heard gunshots. (Tr. at 334). She testified that she ran into the house and looked outside to see people running. (Tr. at 335). She called the police and heard more gunshots while on the phone. (Tr. at 336). She testified that she looked out the window to the side of the house and saw the victim lying on the ground and someone standing over him. (Tr. at 337-338). She did not see a gun or hear gunshots at that time and she did not see who was standing over the victim. (Tr. at 338-340).

Case No. 23 MA 0098

{¶29} Ms. Miller testified that she talked to the police and told them what she witnessed. (Tr. at 342). She was shown a photo array and was asked to identify the person who shot the victim. (Tr. at 343). She identified Appellant in the photo array. (Tr. at 344).

{¶30} On cross-examination, Ms. Miller agreed that she gave no description of the person who shot the victim at the time and told police that she did not even look at the shooter. (Tr. at 351-352). She admitted that her brother went to school with Appellant and she knew Appellant through him. (Tr. at 354). Ms. Miller testified that she did not see the shooter, but she identified Appellant in a photo array as the person who shot the victim. (Tr. at 337-340).

{¶31} Janei Tompkins testified that she was sitting on the porch when she saw Ms. Scott and Ms. Langston pull up on the street in front of the house. (Tr. at 360). She saw someone walking down the street toward the house, she heard gunshots, and saw the victim take off running. (Tr. at 361). She did not see who shot the victim and did not pick anyone out of a photo array that was presented to her. (Tr. at 367-368).

{¶32} Latuwanda Scott testified that she knew Appellant as he is her cousin's brother. (Tr. at 380). She stated that she and Ms. Langston, her sister, had their sons in the backseat of the car when they pulled up to the curb in front of the house. (Tr. at 381). She testified that the victim walked up to her door as she had the door open. (Tr. at 381-382). She testified that she saw a car drive by and the victim remarked that it was her cousin "Kevin" who was driving. (Tr. at 382).

{¶33} Ms. Scott testified that as Ms. Miller was walking back up to her house, Ms. Scott saw Appellant standing at the corner and walking toward her car. (Tr. at 384). She testified that she heard a gunshot and then saw Appellant coming down the street while the victim was standing inside of her car door. (Tr. at 385). She testified that the victim started running and she did not see Appellant as he ran by her. (Tr. at 385). She stated that she heard gunshots as Appellant and the victim ran around the back of the house and came up between the houses. (Tr. at 385-387). She further testified that as the victim was running back from behind the house towards her car to the field between the two houses, she saw Appellant shoot the victim and the victim collapse face down. (Tr. at 388-389). She stated that as the victim laid face-down on the ground, she saw

Appellant standing over him still shooting. (Tr. at 389). She testified that she wanted to get out of the car to check on the victim, but Ms. Langston pulled her back in so they could leave. (Tr. at 390).

**{¶34}** Ms. Scott described Appellant as wearing a white hat, white shirt, blue shorts, and white shoes on the day in question. (Tr. at 392). She stated that the police came to her house, she told them what she saw, and she told them Appellant's name as the shooter. (Tr. at 392-393). She identified Appellant in a photo array. (Tr. at 394).

**{¶35}** On cross-examination, Ms. Scott stated that she did not tell Detective Kelty on the day of the shooting that she drove off as soon as she heard gunshots. (Tr. at 398). She also stated that she thought she gave a description to Detective Kelty of the shooter's clothing, but she then stated that she did not provide it on the day of the shooting. (Tr. at 399). Ms. Scott also testified that she thought she told the police that she saw Appellant after the shooting at the house of her aunt's friend. (Tr. at 400). She agreed that it was more likely that she drove off right after the shooting began because of the children in the car. (Tr. at 403). On recross-examination, Ms. Scott admitted that she knew Appellant prior to the date of the shooting. (Tr. at 409).

**{¶36}** Diane Langston testified that she had known Appellant since they were little as they went to school together. (Tr. at 411-412). She stated that she and Ms. Scott drove to the victim's house to visit and they had their children in the backseat. (Tr. at 412-413). She stated that they stopped in front of the house and the victim walked over to the driver's side and Ms. Miller came over to her side. (Tr. at 413). She testified that they saw a car drive by and the victim said that "Kevin" was in that car. (Tr. at 414).

**{¶37}** Ms. Langston stated that she saw someone walking down the street towards them and the victim said that it was Ms. Scott's cousin, Kevin. (Tr. at 415). She testified that she heard a gunshot, saw the victim run around the house, and then she saw him collapse. (Tr. at 415). She testified that she saw Appellant standing over top of the victim shooting him while the victim laid on the ground. (Tr. at 415). She stated that she could see the victim and Appellant running because she turned back to the children, who were crying in the backseat after the gunshot. (Tr. at 416). She testified that she did not know it was Appellant when she heard the first shot because there was a glare on the window. (Tr. at 416). However, she saw Appellant when they ran behind the car and

she saw them when they were between the houses. (Tr. at 416-417). She testified that she saw the victim collapse to the ground face first and heard and saw Appellant shoot the victim as he stood over him. (Tr. at 418). She identified Appellant as wearing a white shirt, blue jean shorts, or a white or blue cap both at the scene and at the house where they spoke to Ms. Scott's aunt. (Tr. at 420). She was given a photo array and identified Appellant from the array. (Tr. at 420-421).

{¶38} On cross-examination, Ms. Langston testified that she and Ms. Scott were shown the photo array together and she picked Appellant out of the array. (Tr. at 425). She acknowledged that she and Ms. Scott spoke at the interview together and she gave a statement to police. (Tr. at 425). She stated that she gave Detective Kelty a description of what Appellant was wearing that day. (Tr. at 427). Ms. Langston stated that Ms. Scott tried to get out of the car to go over to the victim, but she pulled her back into the car. (Tr. at 428).

{¶39} Officer Anthony Marzullo testified that he worked in the crime lab and was certified as an evidence technician. (Tr. at 467-471). He stated that police conducted no DNA testing or fingerprinting on the shell casings or bullets because "[w]hen a bullet is fired from a gun, the heat that is created from the gunpowder inside there, it basically just burns off any type of DNA or fingerprints, anything like that on an object like that." (Tr. at 482). He testified that they found no weapon at the scene and no gunshot residue test was performed because gunshot residue only lasts for a short time. (Tr. at 484-486).

{¶40} On cross-examination, Officer Marzullo testified that the report from the Bureau of Criminal Identification (BCI) stated that BCI only conducted testing for markings on the bullets in order to narrow down the type of gun used in the shooting. (Tr. at 491). He stated that the report did not indicate that police requested a DNA analysis or fingerprinting. (Tr. at 491). He also acknowledged that police did not test the "D.J." engraved shell casing even though it would take a "tremendous amount of contact" on the bullet and casing to engrave the initials as a person would have to remove the bullet from the shell casing, put the initials on it, and pack it back up. (Tr. at 493). When counsel asked if he was a DNA expert or knew if DNA could burn off of a shell casing, Officer Marzullo responded that he was not an expert, but DNA could burn off of a shell casing.

(Tr. at 493). He acknowledged that nothing gathered at the scene implicated Appellant as involved with the crimes. (Tr. at 498).

**{¶41}** Marsol Young testified. (Tr. at 512). He stated that his house is next to the duplex where Ms. Miller and the victim lived. (Tr. at 512). He stated that on the night in question, he heard more than five gunshots and heard shots coming toward the back of his house. (Tr. at 515). He saw one man chasing another and was not familiar with either of them. (Tr. at 516). He saw the victim fall to the ground and saw the other man standing over him with a gun, shooting him. (Tr. at 519). He then saw the man run off down the street. (Tr. at 519). He identified Appellant in the courtroom as the shooter from that day. (Tr. at 519). Mr. Young testified that police tried to talk to him the night of the shooting, but he refused to get involved. (Tr. at 521).

**{¶42}** On cross-examination, Mr. Young testified that his courtroom identification was the first time that he identified Appellant as the shooter. (Tr. at 525).

**{¶43}** Detective Kelty also testified for the State. (Tr. at 540). He stated that after he left the scene of the shooting that night, he went to the police department to interview Ms. Miller and record her statement. (Tr. at 547). He testified that at that time, police had Appellant as a suspect based on Ms. Miller's statement to responding officers at the scene. (Tr. at 547). He created a photo array and showed it to Ms. Miller, who picked out Appellant. (Tr. at 550).

**{¶44}** Detective Kelty stated that Ms. Miller gave him the names of Ms. Scott and Ms. Langston and he went to their house and interviewed them separately. (Tr. at 552). He took Ms. Scott's statement and showed her a photo array where she picked Appellant out of the array. (Tr. at 552). Ms. Scott told him that she knew Appellant and recognized him immediately at the scene. (Tr. at 555). Detective Kelty then interviewed Ms. Langston, and showed her the photo array, where she also picked out Appellant. (Tr. at 556-557).

**{¶45}** Detective Kelty testified that Appellant was apprehended four days later. (Tr. at 559). He stated that no weapon was found on the victim and they did not recover the murder weapon. (Tr. at 560).

**{¶46}** On cross-examination, Detective Kelty agreed that the investigation was nearly completed within one-and-one-half hours. (Tr. at 562). He also agreed that

Appellant turned himself in and was not apprehended. (Tr. at 563). Detective Kelty noted that the police have since modified the way that they present photo arrays, and the investigating officer cannot show the witnesses the array. (Tr. at 567-568).

**{¶47}** Detective Kelty acknowledged that his notes indicated that Ms. Scott and Ms. Langston told him that they left once the gunshots began. (Tr. at 572). He stated that Ms. Scott provided him with a description of the shooter's clothing, but Ms. Langston did not. (Tr. at 573). When he was provided with his notes, Detective Kelty acknowledged that his notes did not reference a description of the perpetrator's clothing by Ms. Miller, Ms. Scott, or Ms. Langston. (Tr. at 575).

**{¶48}** Detective Kelty further noted that when speaking with Ms. Tompkins after the shooting, she mentioned a different last name for the perpetrator Kevin. (Tr. at 591). He stated that she did not know the last name, but even when he discovered another last name, he did not follow up on it. (Tr. at 592).

**{¶49}** Solomon Fulero, Ph.D. testified for Appellant. (Tr. at 602). He testified as to his work in the field of eyewitness evidence and the unreliability of such evidence. (Tr. at 608).

**{¶50}** While a few inconsistencies existed in the testimony, we held on direct appeal that Appellant's conviction was not against the manifest weight of the evidence. The jury determined the credibility of the witnesses and their testimony on direct and cross-examination, and they heard expert testimony concerning eyewitness evidence that was presented by Appellant.

**{¶51}** We find that the trial court did not abuse its discretion by denying Appellant's application for DNA testing. The court properly found that the presentation of evidence excluding Appellant's DNA on the shell casings or bullets at trial would not be outcome determinative given the testimony presented at trial. More than one witness identified Appellant as the shooter at trial and at least two of those witnesses were familiar with Appellant.

**{¶52}** For these reasons, Appellant's first assignment of error lacks merit and is overruled.

**{¶53}** In his second assignment of error, Appellant asserts:

Case No. 23 MA 0098

**THE TRIAL COURT ERRED AND DENIED APPELLANT DUE PROCESS OF LAW AND FUNDAMENTAL FAIRNESS WHEN IT DENIED APPELLANT'S APPLICATION FOR DNA TESTING WITHOUT HAVING REQUIRED THE PROSECUTING ATTORNEY TO USE REASONABLE DILIGENCE TO DETERMINE WHETHER BIOLOGICAL MATERIAL WAS COLLECTED OR AVAILABLE FROM THE CRIME SCENE OR VICTIM OF THE OFFENSE PURUSANT TO R.C. 2953.75.**

**{¶54}** Citing *State v. Warren*, 2022-Ohio-4743, 203 N.E.3d 903 (2d. Dist.), Appellant contends that his due process rights were denied because the trial court failed to order the prosecutor to prepare and file a report under R.C. 2953.75 concerning the presence of biological material on the shell casings and bullets, the chain of custody, and the reliability of the parent samples of the material. He submits that DNA can survive on shell casings and bullets after a gun is fired and the police in this case admitted that they did not request DNA testing or fingerprints on the bullets and shell casings. Appellant notes that one of the two slugs found under the victim's body had the initials D.J. carved into it. Appellant posits that the bullets left under the victim's body may have been placed there as the perpetrator's "signature" and may contain DNA. He also notes that two of the shell casings were from two different brands.

**{¶55}** Appellee asserts that in *State v. Buehler*, 113 Ohio St.3d 114, 2007-Ohio-1246, 863 N.E.2d 124, the Ohio Supreme Court gave the trial court the discretion to determine whether to first address the outcome determinative prong or order the prosecutor to prepare a report under R.C. 2973.75. Appellee does not refute that a small amount of a handler's DNA may be transferred to ammunition when loading a firearm. However, Appellee asserts that the amount of DNA deposited varies based on a number of factors, including the initial preservation and handling of the bullets and casings when the crime occurred.

**{¶56}** Appellee quotes the affidavit provided by a DNA technical leader at BCI in the case of *State v. Noling*, 153 Ohio St.3d 108, 2018-Ohio-795, 101 N.E.2d 435, ¶ 20. The technical leader's affidavit advised that:

Case No. 23 MA 0098

> [i]n the 1990s, BCI laboratory, latent-print, and firearms analysts did not follow sterile procedures to minimize low-level contamination. He stated that the "use of current-or-future DNA tests on evidence which has been clearly subject to contamination, followed by the assertion that the presence of unattributable partial results are evidence of alternative subjects does not shed light on who may have touched the casings or jewelry box during the crime in 1990."

*Id.* at ¶ 19. The technical leader stated that he could "think of no way to rule out contamination from years of mishandling." *Id.*

{¶57} Appellee concludes that even though a small amount of DNA may transfer to shell casings while loading a firearm, "DNA testing today is not necessary outcome determinative given the preservation and handling of that evidence when the crime was first committed." (Appellee's Br. at 10). Appellee contends that the trial court therefore correctly ruled that a DNA evidence report was not necessary under R.C. 2953.75 because it determined that DNA testing would not be outcome determinative.

{¶58} R.C. 2953.73(B) directs that a court may accept an eligible offender's application for DNA testing only if certain criteria are met, one of which requires a showing by the offender that a DNA exclusion result would be outcome determinative. R.C. 2953.74(C) and R.C. 2953.75 instruct the court to require the prosecutor to prepare a report regarding the existence, contamination, usefulness, degradation, and chain of custody of biological material and parent sample relating to material collected at the crime scene.

{¶59} As pointed out by the Ohio Supreme Court in *State v. Buehler,* 113 Ohio St.3d 114, 2007-Ohio-1246, 863 N.E.2d at ¶ 30, the above statutes do not contain a sequential order for the trial court to follow. The Court read R.C. 2953.74(C) *in pari materia* with the other relevant post-conviction DNA testing statutes and held that a trial court has the discretion "as to whether it will first determine whether the eligible inmate has demonstrated that the DNA testing would be outcome-determinative or whether it should order the prosecuting attorney to prepare and file a DNA evidence report pursuant to R.C. 2953.75." *Id.* at ¶ 36. The Court based this conclusion on the reading of these

Case No. 23 MA 0098

statutes, in conjunction with the principle that a court will not perform an act in vain when no real issue is presented. *Id.* at ¶ 34.

{¶60} Accordingly, the trial court in this case did not err by applying its discretion and addressing the outcome determinative factor first, rather than ordering the prosecution to prepare a DNA evidence report.

{¶61} Appellant's second assignment of error lacks merit and is overruled.

{¶62} For the reason stated above, the trial court's judgment is hereby affirmed.

Robb, P.J., concurs.

Klatt, J., concurs.

[Cite as *State v. West*, 2024-Ohio-1103.]

—————————————

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed. Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**