[Cite as *State v. Reese*, 2025-Ohio-1916.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

LAMAR REESE,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 24 MA 0106**

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2013 CR 00828 A

**BEFORE:**
Carol Ann Robb, Mark A. Hanni, Katelyn Dickey, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Lynn Maro,* Mahoning County Prosecutor*, Atty. Ralph M. Rivera,* Assistant Mahoning County Prosecutor, for Plaintiff-Appellee and

*Lamar Reese*, pro se.

Dated: May 21, 2025

**Robb, P.J.**

{¶1} Defendant-Appellant Lamar Reese appeals the decision of the Mahoning County Common Pleas Court denying the post-conviction application for DNA testing filed in his criminal case. Although the cited type of DNA testing existed at the time of his 2014 trial, Appellant assumes more recent developments in the field increased the likelihood of finding comparable DNA on a fired shell casing. Appellant then argues he satisfied the statutory outcome determinative test by claiming he could be exonerated if DNA is found and if he is excluded as a contributor. For the following reasons, the trial court's judgment is affirmed.

<u>STATEMENT OF THE CASE</u>

{¶2} On September 16, 2011, seventeen-year-old Joshua Davis was shot multiple times while standing on his front porch in Youngstown just before midnight. On August 15, 2013, Appellant was indicted for aggravated murder in violation of R.C. 2903.01(B) (a life-felony) and aggravated robbery in violation of R.C. 2903.01(B) (a first-degree felony), with firearm specifications attached to both counts. A co-defendant was also indicted.

{¶3} The co-defendant's case was severed prior to trial after the court accepted a request for the stipulated use of Appellant's future polygraph test results. Under the stipulation, the state agreed to dismiss the charges if the results were favorable to the defense while Appellant agreed to stipulate to the admission of the results if they were unfavorable to him. At the jury trial, the polygraph examiner testified about Appellant's unfavorable polygraph results on the questions asking Appellant whether he shot the victim, physically did anything to help kill the victim, saw the victim get shot, or was present at the time of the shooting.

{¶4} The state also presented the testimony of the co-defendant's half-brother ("the eyewitness"). According to his testimony, on the day of the murder, he was near his mother's house when he encountered the co-defendant with three people. Of the three, he knew Appellant and a named individual (also called "Noodles") after meeting them in the days preceding the murder, but he did not know the third individual ("unnamed witness").

**{¶5}**  When this group asked the eyewitness about purchasing a large amount of marijuana ($500-600 worth), he contacted the victim to arrange a purchase at the victim's house.  The eyewitness said the group had the money to make the purchase, but somehow the plan evolved to having Appellant's co-defendant steal the drugs by grabbing them while on the victim's front porch and then fleeing.  The eyewitness said there was no plan to assault the victim; however, he acknowledged a concern over whether the victim would be armed (due to his occupation).

**{¶6}**  As a result, the eyewitness obtained his mother's 9mm handgun and carried it on his waist.  He said Appellant's co-defendant was carrying a .40 caliber Glock handgun and Appellant was carrying a 9x19mm assault rifle, which is a gun that uses 9mm ammunition.  The eyewitness drove the group to the victim's house in his mother's black SUV.  Under the plan, he and his brother were to call on the victim while Appellant and the other two people were to stay in the vehicle.

**{¶7}**  The eyewitness called the victim when they arrived at the house.  A red SUV belonging to the victim's mother was parked in the driveway.  The victim greeted the eyewitness and his brother at the front door and brought them through the house from the front porch into the garage to retrieve and/or weigh the marijuana.  They thereafter accompanied the victim back to the front porch.  The eyewitness was preparing to count the money while the victim had his hands in (or on their way out of) his coat pockets as if retrieving the marijuana.

**{¶8}**  At this point, the eyewitness noticed Appellant standing with the assault rifle near the house by the red SUV.  He said he instantly knew something was not right, suggesting he was fearful because he only recently met Appellant.  When the eyewitness looked around for the other two members of the group, he noticed they remained in his vehicle.  The eyewitness backed toward the porch stairs while making comments in an attempt to de-escalate the situation.

**{¶9}**  However, Appellant "cocked his gun back" while pointing the assault rifle at the victim and making his way to the front porch.  The victim started yelling for his mom and putting his hands back in his pockets, at which point Appellant's co-defendant pulled out his .40 caliber handgun and pointed it at the victim.

{¶10} While alighting from the porch, the eyewitness heard a shot. He started running and heard two or three more shots. He tried to get in his vehicle, but it was locked; the unknown witness was attempting to put the vehicle in gear. The eyewitness fled the scene on foot (at one point briefly running into the unknown witness, who ended up fleeing on foot as well). The eyewitness hid his gun in a bush before reaching his grandmother's house where his father retrieved him. Then, after arriving at his father's house, he was instructed to get in a waiting vehicle containing the co-defendant (his brother) and Noodles; the driver of that vehicle dropped them off near his mother's house. That night, he went with his mother to retrieve her gun and her SUV, which ended up a couple streets away from the victim's house.

{¶11} In the days after the event, the eyewitness lied to the police about his knowledge and involvement. He pointed to his reluctance to incriminate his brother and also alluded to his fear of Appellant since he was essentially unknown to him. Two years later, the eyewitness changed his mind after the police revealed his brother incriminated him as the shooter during a videotaped interview. Upon learning this, the eyewitness told the police about the events contained in his testimony. Later, he entered a deal with the prosecutor to testify truthfully against his brother and Appellant in order to avoid being charged in the case.

{¶12} The victim's mother testified her son exited the front door of their house after receiving a call. She knew he sold marijuana and believed he possessed $1,000, which she gave him earlier in the day in order to purchase a vehicle. She heard gunshots, the slamming of car doors, and a car speeding off. She then found him on the front porch and called 911. She followed the ambulance in her red SUV; her son died shortly after arriving at the hospital.

{¶13} A passerby testified he was riding his bicycle past the victim's house when he saw approximately four black males on the front porch and a dark SUV parked on the street. As he passed, he heard someone call out, "Mom, mom" and then heard approximately four gunshots. He turned and saw people running off the front porch past the vehicle in the street; some then ran back to the vehicle. This witness sought shelter in a nearby house.

{¶14} The resident of that nearby house testified to hearing the victim call to his mother followed by gunshots. After ducking and then opening the door for the bicyclist, she saw a dark SUV traveling on the street. Next, a visitor in her house testified to hearing, "Mom, mom, open the door" before the gunshots. She also saw the SUV driving away before going to comfort the victim's mother on the front porch.

{¶15} A police officer, who was the first emergency responder at the scene, noticed the victim's hands were in his coat pockets with a large bag of marijuana falling out of a pocket. The officer thereafter watched as a paramedic removed bags of marijuana from the victim's pockets and placed them on the porch before rushing the victim to the hospital.

{¶16} A crime science investigator testified six bags of marijuana were recovered. A spent 9mm shell casing was found on the front porch closer to the railing and driveway. (St. Ex. 15). A spent .40 caliber shell casing was found on the porch closer to the house. (St. Ex. 16). A small black scale was also found near the victim.

{¶17} The pathologist testified the victim died from multiple gunshot wounds. At least four separately-fired shots hit his body, the order of which was not ascertainable. One shot left a ring of soot as it entered the left outer thigh and exited the inner thigh near the groin. The unrecovered bullet causing this wound was believed to have re-entered the body, causing a gunshot wound entering the tip of the penis and exiting the right side of the base of the penis.

{¶18} A second bullet left a ring of soot where it entered the upper right pelvic area (just below the hip pointer) and was recovered from the hip. The pathologist testified the rings of soot indicated the gun was in contact with the body when those shots were fired.

{¶19} A third bullet entered the top of the victim's left shoulder, traveled slightly downward, and exited the victim's right upper back. As to this wound, the pathologist noticed a rim of grease produced from the barrel of a gun but no soot, thus labeling it an indeterminate range shot.

{¶20} A fourth bullet entered under the victim's left jaw, traveled slightly upward and to the right under the base of the skull, and exited the back of the upper neck. The range of the shot could not be determined.

Case No. 24 MA 0106

**{¶21}** Upon discovering the eyewitness called the victim's phone just prior to the shooting, the police went to his residence and saw the black SUV owned by the eyewitness' mother. Because witnesses reported a dark SUV fled the scene of the murder, the police sought and received permission to analyze this vehicle. A gunshot residue test from the steering wheel (conducted more than a week after the murder) came back negative.

**{¶22}** A month before the murder, the mother of the eyewitness reported firing shots at attempted intruders. From that investigation, the police had access to spent 9mm shell casings from her 9mm. Ballistic testimony was presented by a BCI forensic scientist. He ascertained the marks on those casings from the prior event did not match the 9mm spent shell casing found by the victim's body. Also, none of the 9mm shell casings were fired from the same gun as the .40 caliber shell casing found at the murder scene, confirming prior testimony that the different shells were not interchangeable. This expert also opined a bullet recovered from the victim's hip had characteristics consistent with being fired from a .40 caliber Glock.

**{¶23}** A "jailhouse snitch" testified he went to school with Appellant when they were younger and was incarcerated with him in the fall of 2013, after the indictment in this case. When Appellant spoke to his co-defendant through a metal door separating the pod from the recreation center, this witness overheard them naming two tipsters who started cooperating with the police in the investigation of the murder of Josh Davis. Later, Appellant reportedly told this witness one tipster was their driver (naming the eyewitness) but the other one could not hurt the case because he was not present at the scene. According to the testimony of the jailhouse snitch, Appellant explained "it was supposed to be a robbery, but it went bad" and "we shot" the victim.

**{¶24}** Next, a detective testified about the investigation. He also read a letter Appellant sent to his co-defendant a year after the murder and prior to their indictment (when they were both incarcerated on other charges). The letter contained statements such as:

> When we get out bra, we got to get to this money and do big thangs. You
> know I'm on whatever. You got me. We bout to run over these lame niggas.
> We just got to stay in touch bra. Hit me up, and Ima hit you up. I gotchu.

What's been going down doe? And you be hearin' shit from that one thang? I ain't been hearin' shit, niggas just ain't been talkin'. That's a good thing doe. We gotta move on my nigga and get this paper. We a team fuck them otha niggas . . . Write me back. Let me know what's going down. Stay strong. . . Real niggas do real things. Stay strong.

(St.Ex. 33A-B).

{¶25}  On April 21, 2014, the jury found Appellant guilty as charged.  The trial court imposed consecutive sentences of 20 years to life for aggravated murder, 10 years for aggravated robbery, and three years for merged firearm specifications.  (8/7/14 J.E).  This court affirmed Appellant's conviction.  *State v. Reese*, 2016-Ohio-557 (7th Dist.).

{¶26}  On October 4, 2024, Appellant filed an application for DNA testing on the form provided by the attorney general under R.C. 2953.73, seeking testing of "Exhibit number 15, the 9mm shell casing that was found on the porch next to the victim."  In claiming an exclusion of Appellant's DNA from the fired casing would be outcome determinative, his application emphasized this casing, attributed to him, was found on the front porch where the co-defendant and his brother were standing with the victim (rather than in the driveway where the brother initially placed Appellant).  He also interpreted the testimony as meaning a casing would fall where the shooter was standing.  Pointing out his co-defendant was found not guilty (in a separate trial), he referred to information allegedly elicited at the co-defendant's trial, claiming:  the co-defendant's brother looked back while running away and noticed the co-defendant reach over the victim's body; a passerby who saw people on the porch did not notice anyone in the driveway; and the neighbor's visitor saw people flee from the porch without noticing a 9mm rifle.

{¶27}  The state's response pointed out division (B)(2) of R.C. 2953.74 was inapplicable because the 9mm shell casing Appellant cites for testing was submitted to BCI for ballistics analysis and comparisons but not for DNA testing prior to the 2014 trial.  Citing various cases, the state also urged the alternative in division (B)(1) was not satisfied because touch DNA was available years prior to Appellant's trial.  Regardless, the state argued DNA testing would not meet the statute's outcome determinative test.

{¶28}  On November 7, 2024, the trial court denied Appellant's application for DNA testing of the 9mm shell casing.  The court said the application did not satisfy R.C.

2953.74(B) because touch DNA testing was available at the time of trial, there was no testimony on DNA at trial, and Appellant failed to establish the testing would be outcome determinative in any event. Appellant filed a timely appeal.

STATUTORY APPLICATION FOR DNA TESTING

{¶29} R.C. 2953.74(B) provides the court may accept the application of an eligible offender only if division (1) or (2) applies. Division (B)(2) involves a case where DNA testing was performed at the trial stage, this prior result was not a definitive test, and DNA testing is requested on the same biological evidence. R.C. 2953.74(B)(2). The parties agree division (B)(2) is not at issue here, with the state specifically saying DNA was not tested at the trial stage and Appellant focusing solely on the language in (B)(1).

{¶30} Division (B)(1) applies when the offender did not have a DNA test taken at the time of trial and contains two additional requirements, both of which the trial court found Appellant failed to demonstrate. First, the defendant must show "at the time of the trial stage in that case, DNA testing was not generally accepted, the results of DNA testing were not generally admissible in evidence, or DNA testing was not yet available." R.C. 2953.74(B)(1).

{¶31} Upon assuming the result will be an exclusion of the defendant as a contributor, division (B)(1) additionally requires the defendant to show "that DNA exclusion when analyzed in the context of and upon consideration of all available admissible evidence . . . would have been outcome determinative at that trial stage in that case . . ." *Id.* The subsequent division likewise requires the court to find any exclusion would be outcome determinative in order accept the application. *See* R.C. 2953.74(C)(3)-(5) (the application cannot be granted unless identity was at issue and the defense theory set forth at trial "was of such a nature that, if DNA testing is conducted and an exclusion result is obtained, the exclusion result will be outcome determinative" and "if DNA testing is conducted and an exclusion result is obtained, the results of the testing will be outcome determinative regarding that offender").

{¶32} The term "outcome determinative" is statutorily defined: "had the results of DNA testing of the subject offender been presented at the trial . . . and had those results been analyzed in the context of and upon consideration of all available admissible evidence related to the offender's case . . . there is a strong probability that no reasonable

Case No. 24 MA 0106

factfinder would have found the offender guilty of that offense . . ." R.C. 2953.71(L). The trial court is to consider the application, supporting affidavits, and documentary evidence along with all the files and records "pertaining to the proceedings against the applicant" and "is not required to conduct an evidentiary hearing in conducting its review of, and in making its determination as to whether to accept or reject, the application." R.C. 2953.73(D).

{¶33} As explained by the Ohio Supreme Court, the decision on an application for post-conviction DNA testing is within the trial court's sound discretion exercised on a case-by-case basis depending on the particular facts of the case, and the appellate court reviews for an abuse of discretion by considering whether the trial court's decision was unreasonable, arbitrary, or unconscionable. *State v. Scott*, 2022-Ohio-4277, ¶ 10, 12. The Supreme Court has also pointed out a trial court need not make determinations on whether to order a report to ascertain if a testable biological sample exists if the court evaluates the record and finds a DNA result would not be outcome determinative. *State v. Buehler*, 2007-Ohio-1246, ¶ 34-37 (concluding the trial court reasonably exercised its discretion in finding a DNA test excluding the defendant as the source of material retrieved from under the murder victim's fingernails would not be outcome determinative).

ASSIGNMENT OF ERROR

{¶34} Appellant's pro se brief raises the following assignment of error:

"The trial court erred in denying the Application for DNA testing."

{¶35} Appellant argues he satisfied the requirements of R.C. 2953.74(B)(1). First, he claims developments in touch DNA since his 2014 trial increased the type of evidence that can be tested for DNA profiles and run through the Combined DNA Index System (CODIS) in search of matching DNA profiles. His argument suggests a belief the year 2021 saw advancements in DNA testing of and profile recovery from shell casings subjected to the heat of being fired by a gun.

{¶36} However, this contention seems to be based on a misreading of a case he cites. For instance, in remanding for further exercise of trial court discretion, the First District initially observed, "In 2021, due to developments in Mini-STR or 'touch DNA' testing that greatly increased the type of evidence that can now be tested for DNA profiles, Levingston applied for postconviction DNA testing." *State v. Levingston*, 2022-Ohio-

3312, ¶ 3 (1st Dist.). Notably, the court was merely setting forth the facts of the case by explaining when the defendant filed his application for DNA testing (in 2021) and why he filed it (due to developments since the relevant trial proceedings). Furthermore, test developments were not at issue in the *Levingston* appeal. The issue before the appellate court was the trial court's denial of the application by jumping to a conclusion on the unavailability of biological samples under R.C. 2953.74(C) without ordering a report on the existence of sample material. *Id.* at ¶ 14. The appellate court remanded by concluding the trial court could not surmise the non-existence of biological samples, while emphasizing the trial court did not alternatively find the requested DNA test would not be outcome determinative. *Id.* at ¶ 12.

{¶37} To the contrary, the trial court here did make a determination on outcome-determinativeness and did not attempt to rule on the absence of a sample. Plus, *Levingston* involved a January 2009 conviction (for a 2007 murder) and thus dealt with DNA testing from that time period. *See id.* at ¶ 2, citing *State v. Levingston*, 2011-Ohio-1665 (1st Dist.) (affirming conviction) and related cases. Appellant's trial occurred in April 2014.

{¶38} As the state points out, the trial court reasonably concluded Appellant failed to meet his burden of showing touch DNA analysis was unavailable at the time of Appellant's trial and the case law indicates it was available. *See, e.g., State v. Roberts*, 2012-Ohio-5684, ¶ 2-3 (where the Supreme Court stated the defendant's 2010 motion sought to preserve evidence so he could retain an expert to conduct touch DNA analysis to determine if any DNA on the murder victim's out-turned pocket could be matched to the witness who testified against him in his 1997 trial); *State v. Lang*, 2011-Ohio-4215, ¶ 164 (where the Supreme Court recited 2007 trial testimony from a forensic expert about "touch DNA on the surfaces of a firearm"); *see also State v. Johnstone*, 2008-Ohio-3495 (5th Dist.) (where the crime lab analyst testified at a 2007 attempted murder trial about testing the gun for touch DNA).

{¶39} Appellant also failed to show mini-STR was not available at the time of his 2014 trial. *Compare State v. Bunch*, 2015-Ohio-4151, ¶ 45 (7th Dist.) (where *the 2014 application* for DNA testing included *an expert affidavit on mini-STR testing* to show advancements since his 2002 trial, but where we found an exclusion would not be

outcome determinative in any event); *see also State v. Reynolds*, 2009-Ohio-5532 (2d Dist.) (where a *2008 application* for DNA testing showed advancements in DNA testing *{including mini-STR and touch DNA}* could assist in recovering a profile from a smaller or degraded sample).[1]

**{¶40}** On the specific topic of testing a fired casing for DNA, the state points to a recent case from our district where testimony at the jury trial placed a .40 caliber handgun in the defendant's possession at the time of a mass shooting and .40 caliber bullets were recovered from the murder victim and a shooting victim who survived. *State v. Jones*, 2024-Ohio-5935, ¶ 2-5, 14-15 (7th Dist.). That defendant's 2023 application for testing claimed touch DNA analysis of spent shell casings was not available until advancements after his August 2012 trial. *Id.* Finding the trial court did not abuse its discretion in determining the defendant failed to show the requested DNA testing was not yet available at the time of his trial as required by R.C. 2953.74(B)(1), we concluded "[t]ouch or transfer DNA testing was available at the time of Jones' trial" in 2012. *Id.* at ¶ 24-25 (pointing to the "generality encompassed by the statute"). The trial in *Jones* was held more than 1.5 years before the trial in the case at bar. *See id.*; *see also State v. Harwell*, 2022-Ohio-2706, ¶ 24, 38 (2d Dist.) (where the defendant filed a 2021 application seeking a DNA test on shell casings from the murder scene, the court observed, "touch DNA testing was available, accepted, and admissible at the time of his trial" *in 2013*).

**{¶41}** Moreover, in a case cit ed in Appellant's application for DNA testing, the Supreme Court discussed an applicant's 2013 request for touch DNA testing of fired shell casings from a 1990 double homicide scene. *State v. Noling*, 2018-Ohio-795, ¶ 2, 10, 17, 25-26, 29 (where a BCI scientist opined the casing would have been contaminated by improper handling over the years). That application for DNA testing of spent casings occurred prior to Appellant's trial.

**{¶42}** In summary, the trial court did not abuse its discretion in opining the requested DNA testing of the shell casings was available at the time of Appellant's trial.

---

[1] The Second District has since questioned whether proven post-trial advances in DNA technology could even entitle an offender to DNA testing under R.C. 2953.74(B)(1) where DNA testing in general was available at the time of trial but was not performed. *State v. Wilson*, 2024-Ohio-4712, ¶ 20 (2d Dist.).

His application did not mention specific testing or advancements. The cases cited by Appellant do not support a finding that mini-STR or touch DNA testing on spent shell casings was not accepted, available, and admissible at the trial stage of proceedings in his case. Appellant submitted no affidavit or other evidence on the topic. Consequently, the application did not demonstrate the requirement in R.C. 2953.74(B)(1) mandating the applicant show "at the time of the trial stage in that case, DNA testing was not generally accepted, the results of DNA testing were not generally admissible in evidence, or DNA testing was not yet available." In accordance, his first appellate argument is without merit.

{¶43} Regardless, Appellant has not satisfied the outcome determinative requirement, which is an additional requirement under R.C. 2953.74(B)(1). *See also* R.C. 2953.74(C)(3)-(5). In the *Buehler* case cited in Appellant's application, the Supreme Court pointed out a co-defendant testified how he and the defendant beat the murder victim, a DNA test result from the sample under the victim's fingernails excluding the defendant would not be outcome-determinative in view of independent evidence including the co-defendant's testimony, blood-spatter pattern, and the defendant's actions after the crime. *Buehler*, 2007-Ohio-1246, at ¶ 37 (expressing no concern that a third profile could hypothetically be found).

{¶44} Appellant's brief cites cases he believes involve the affirmance of a conviction based solely on the presence of one piece of identifying evidence (such as DNA on a shell casing at the scene) and argues if such evidence can be the sole evidence for conviction, then the presence of someone else's DNA on the casing must be outcome determinative for a testing application. *See, e.g., State v. Sharpe*, 2023-Ohio-2570, ¶ 71 (7th Dist.). He notes the *Sharpe* case observed, "The most significant evidence against Appellant was the presence of his DNA on a shell casing found at the scene . . . This Court has previously affirmed convictions based on a single piece of identifying evidence." *Id.* at ¶ 71, 74. However, the court then pointed out, "the jury here was provided with more than just the DNA evidence. Appellant's behavior prior to and after the shooting are at least as incriminating as the DNA found at the scene." *Id.* at ¶ 75. Also, the cited opinion was made while evaluating the evidence in a direct appeal where the defendant contested the weight of the evidence including the evidence on the probability that he was

a likely contributor to the DNA on the shell. *Id.* at ¶ 66-85. The cited *Sharpe* case did not involve a post-conviction application for DNA testing

**{¶45}** Appellant also reasons that if another person's DNA is recovered from the fired 9mm shell casing, then his case is similar to an Ohio Supreme Court case where biological samples from a 1990 murder were never tested for DNA and the Court found "an exclusion result would create sufficient doubt about key pieces of evidence in this case, demonstrating a strong probability that no reasonable juror would have found Scott guilty beyond a reasonable doubt." *See Scott*, 2022-Ohio-4277, at ¶ 14. We point out the *Scott* Court emphasized the eyewitness who testified about circumstantial evidence at the 1992 trial later twice formally recanted (during an interview in 2009 and during an official police interview in 2015). *Id.* at ¶ 15-16.

**{¶46}** Appellant disparages the state's evidence against him such as the credibility of the co-defendant's brother and the alleged impropriety of the polygraph (which he challenged in the direct appeal and in a post-conviction petition). It is noted the co-defendant's brother testified he brought a different potential purchaser to the victim's house the prior day with the sale falling through due to a conflict about weighing the drugs and proof of funds. He insists he deserves the same outcome as the co-defendant; however, the co-defendant was found not guilty at a separate trial, and his transcript is not part of the record in this case. Appellant's application for DNA testing additionally referred to his co-defendant allegedly claiming in a letter at some unknown time that Appellant was not present at the crime scene. The letter is also not present in the record. The co-defendant was not a witness against Appellant, was acquitted by a different jury, and cannot be retried. The co-defendant's acquittal is not a negation of the evidence presented against Appellant.

**{¶47}** Unlike the situation in *Scott*, there was no recantation by the eyewitness who testified at Appellant's trial. The eyewitness here was present for the planning of the theft of drugs and viewed the firearms to be carried by each participant. The eyewitness said Appellant was supposed to wait in the vehicle but surprisingly left the vehicle and took up an armed position with a close view of the victim's front door. There was also no recantation by the jailhouse snitch who testified about Appellant's incriminating statements after indictment.

Case No. 24 MA 0106

{¶48} We refer to our Statement of the Case above for the full recitation of the facts presented at Appellant's trial based on our review of the trial transcript. Most notably, the eyewitness specifically testified Appellant pointed a 9x19mm assault rifle at the victim and then "cocked the gun back" while approaching the victim's position on the front porch just before the first shot. At least three more shots were fired as the eyewitness ran from the scene. At least four bullets struck the victim, twice in the neck/shoulder area, and twice in the pelvic/thigh area, with some bullets seemingly fired from differing angles.

{¶49} The eyewitness also said he saw Appellant's co-defendant point a .40 caliber handgun at the victim. Although a .40 caliber fired shell casing was recovered from the front porch by the house, a 9mm fired shell casing was also recovered from the front porch near the railing/driveway, showing two different weapons were fired. The 9mm casing did not match casings previously fired from the gun the eyewitness borrowed from his mother, indicating the eyewitness was not the other shooter as Appellant suggests.

{¶50} Contrary to Appellant's contention, the eyewitness did not testify Appellant stayed by the red SUV in the driveway where, upon alighting from the house, the eyewitness first spotted him. Rather, the eyewitness specifically said Appellant moved toward the porch with the assault rifle. In addition, there is also no indication a casing would perfectly and softly fall straight down or necessarily land at a shooter's feet once fired. Rather, testimony indicates a casing would be *ejected*, can bounce or roll, and may not fall near the shooter's foot position if it landed on a platform (such as a porch) over which the shooter's arm is extended. The polygraph results admitted under Appellant's stipulation showed he was deceptive about being a shooter and about his presence at the scene.

{¶51} Lastly, this was not a single perpetrator event, and the identity of the person who loaded the gun carried by Appellant during the offense planned by the group was not a determinative issue in the case against Appellant. The jury was instructed on complicity. A person who is complicit can be prosecuted and punished as if he were a principal offender. R.C. 2923.03(F) (even if the charge is stated in terms of the principal offense). Aiding and abetting exists where the evidence shows "that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission

of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Johnson*, 93 Ohio St.3d 240, 245 (2001). *See also State v. Treesh*, 90 Ohio St.3d 460, 485 (2001) (circumstantial evidence inherently possesses the same probative value as direct evidence; and the surrounding facts and circumstances are the traditional indicators of a defendant's intent and can be used to demonstrate whether the defendant shared the intent of the principal).

**{¶52}** Appellant has not demonstrated there is a "strong probability that no reasonable fact-finder would have found [him] guilty of the offenses . . . if a DNA test result excluding [him] had been presented at trial and analyzed in the context of and upon consideration of all available admissible evidence." (Emphasis omitted.) *Scott*, 2022-Ohio-4277, at ¶ 14, citing R.C. 2953.71(L). In other words, we do not find "an exclusion result would create sufficient doubt about key pieces of evidence in this case, demonstrating a strong probability that no reasonable juror would have found [Appellant] guilty beyond a reasonable doubt." *Id.* Accordingly, the trial court did not abuse its discretion in finding Appellant's application failed to demonstrate the requested test would be outcome determinative under the DNA testing statute.

**{¶53}** For the foregoing reasons, Appellant's assignment of error is overruled, and the trial court's judgment is affirmed.

Hanni, J., concurs.

Dickey, J., concurs.

Case No. 24 MA 0106

---

For the reasons stated in the Opinion rendered herein, the assignment of error is overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed.  Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**